Filed 11/21/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| CALIFORNIA VALLEY MIWOK TRIBE, | D064271 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2008-00075326-CU-CO-CTL) |
| CALIFORNIA GAMBLING CONTROL COMMISSION, | |
| Defendant and Respondent; | |
| CALIFORNIA VALLEY MIWOK TRIBE et al., | |
| Intervenors and Respondents. | |


APPEAL from a judgment of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Affirmed.


Manuel Corrales, Jr.; Singleton & Associates and Terry Singleton for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Sara J. Drake, Assistant Attorney General, and Neil D. Houston, Deputy Attorney General, for Defendant and Respondent.

Sheppard, Mullin, Richter & Hampton, John D. Collins, Richard M. Freeman, Matthew S. McConnell and James F. Rusk for Intervenors and Respondents.

California Valley Miwok Tribe (the Tribe) appeals following a summary judgment in favor of defendant California Gambling Control Commission (the Commission). In granting summary judgment, the trial court ruled that until the federal Bureau of Indian Affairs (BIA) indicates, by entering into contract for federal benefits with the Tribe, that an internal tribal dispute about the Tribe's membership and leadership has been resolved, the Commission is justified in continuing to hold in trust for the Tribe certain funds generated from Indian gaming in California that the Commission is required to distribute to the Tribe on a quarterly basis. As we will explain, we conclude that the trial court properly granted summary judgment in favor of the Commission, and accordingly we affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

This matter returns to us for a third time. In our last opinion, we issued a writ of mandate directing the trial court to lift the stay it had imposed and to allow the parties to file dispositive motions.[1] The parties filed dispositive motions, and the trial court

---

[1]     The two previous opinions in this matter are: *California Valley Miwok Tribe v. California Gambling Control Commission* (Apr. 16, 2010, No. D054912) (2010 Opinion) and *California Valley Miwok Tribe v. California Gambling Control Commission* (Dec. 18, 2012, No. D061811) (2012 Opinion).

2

resolved them, entering judgment in favor of the Commission on its motion for summary judgment, which the Tribe now appeals.

To resolve the instant appeal, we once again review the factual and procedural background of this dispute, adding to our previous chronology the most recent developments in the ongoing tribal membership and leadership dispute involving the Tribe. Although the notice of appeal was filed in July 2013, both the Commission and the Tribe have asked us to take judicial notice of a December 13, 2013 order by the United States District Court for the District of Columbia in the federal litigation involving the Tribe. (*California Valley Miwok Tribe v. Jewell* (D.D.C. 2013) 5 F.Supp.3d 86 (*Jewell*).)[2] We grant the parties' requests to take judicial notice of *Jewell*.[3] Accordingly, we conduct our de novo review of the summary judgment ruling taking into account the current status of the federal proceedings involving the Tribe as reflected in *Jewell*. Also, in the course of our preliminary discussion, we refer to *Jewell* for background on the dispute over the Tribe's membership and leadership.

---

[2]    In our previous opinions, we referred to the pending litigation in the district court as "*Salazar*," based on the name of the Secretary of the Department of the Interior at the time. The case name has changed and now reflects the name of the current Secretary of the Department of the Interior, Sally Jewell.

[3]    The Tribe has filed other requests for judicial notice, some of which are opposed. We grant the unopposed requests, and accordingly take judicial notice of exhibits 1, 2, 3, 5, 7 and 8. We deny judicial notice of the documents that are opposed by the Commission, namely exhibits 4 and 6, as neither document is necessary to our analysis of the issues on appeal. (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [declining to take judicial notice of materials not "necessary, helpful, or relevant"].)

A. *The Commission Withholds Funds from the Tribe*

As we previously explained, pursuant to the Indian Gaming Regulatory Act of 1988 (18 U.S.C. § 1166 et seq.; 25 U.S.C. § 2701 et seq.), the State of California has entered into tribal-state gaming compacts with the various tribes in California authorized to operate gambling casinos (collectively, the Compacts).[4] (See Gov. Code, §§ 12012.25-12012.53 [ratifying tribal-state gaming compacts].) The Compacts set forth a revenue-sharing mechanism under which tribes who operate less than 350 gaming devices share in the license fees paid by the tribes entering into the Compacts, so that each "Non-Compact Tribe" in the State receives the sum of $1.1 million per year. (Compacts, § 4.3.2.1.) Non-Compact Tribes are defined as "[f]ederally recognized tribes that are operating fewer than 350 Gaming Devices . . . ." (Compacts, § 4.3.2.(a)(i).) It is undisputed that the Tribe is a Non-Compact Tribe, as it operates no gaming devices and is federally recognized.[5]

The annual payment of $1.1 million to each Non-Compact Tribe is drawn from the Revenue Sharing Trust Fund (RSTF) described in the Compacts. (Compacts, § 4.3.2.1.) The Commission administers the RSTF, with the Compacts providing that "[t]he

---

[4]     We quote from the Compacts as entered into by the State of California with various tribes in 1999. As the Commission points out, however, the standard language used in more recent compacts between the State of California and other tribes is different from the language used in earlier compacts. We do not find the differences in the more recent compacts to be significant to our analysis.

[5]     It is undisputed that the Tribe is identified on the annual list of federally recognized Indian tribes published in the Federal Register. At the Tribe's request, we have taken judicial notice of the most recent version of the list.

Commission shall serve as the trustee of the [RSTF]." (Compacts, § 4.3.2.1(b).) According to the Compacts, "[t]he Commission shall have no discretion with respect to the use or disbursement of the trust funds. Its sole authority shall be to serve as a depository of the trust funds and to disburse them on a quarterly basis to Non-Compact Tribes." (Compacts, § 4.3.2.1(b).) Further, a provision in the Government Code directs that the Commission "shall make quarterly payments from the Indian Gaming Revenue Sharing Trust Fund to each eligible recipient Indian tribe within 45 days of the end of each fiscal quarter." (Gov. Code, § 12012.90, subd. (e)(2).)

The Commission does not dispute that, like all Non-Compact Tribes, the Tribe is eligible for an annual $1.1 million payment under the terms of the Compacts. However, starting in 2005, the Commission, acting as trustee of the RSTF, suspended its quarterly disbursements to the Tribe and decided to hold the funds indefinitely in trust for the Tribe for later distribution. The Commission began withholding the distribution of the RSTF funds to the Tribe when it became aware of a dispute over the tribe's membership and leadership as evidenced by ongoing proceedings and litigation involving the BIA's relationship with the Tribe. As the Commission recently explained in correspondence to the Tribe, the Commission "contends that its designation as trustee of the RSTF impliedly requires it to take reasonable steps to ensure that RSTF funds are disbursed to individuals or groups properly authorized to receive and administer the funds on behalf of their respective tribes." The Commission "takes the position that it lacks the authority or jurisdiction to independently assess the legitimacy of a purported tribal leader or tribal leadership group, and instead relies upon the assessments and conclusions of the

5

Department of the Interior, acting through the Bureau of Indian Affairs . . . , as reflected in the final administrative actions of that agency."  Therefore, the Commission has suspended its disbursement of the RSTF funds to the Tribe "pending [the] BIA's recognition of an authorized . . . Tribe leader or leadership group with which to conduct its government[-]to[-]government business."  As of March 6, 2013, the Commission was holding $8,763,000.99, exclusive of interest, of the RSTF funds payable to the Tribe.

B.      *The Tribe's Leadership and Membership Dispute and Its Litigation with the Federal Government*

The long-running dispute over the Tribe's membership and leadership was recently detailed in *Jewell*.  As our resolution of this appeal requires an understanding of the nature of the current dispute, we turn to *Jewell* for that information.

"In 1906, Congress authorized the BIA to purchase land for use by Indians in California who lived outside reservations or who lived on reservations that did not contain land suitable for cultivation."  (*Jewell*, *supra*, 5 F.Supp.3d at p. 88.)  In 1915, a federal agent located the " 'Sheepranch Indians,' " whose number had purportedly "dwindled down to '13 in number,' " and in 1916, "the BIA acquired approximately 0.93 acres in Calaveras County, California for the benefit of these Indians."  (*Id*. at pp. 88-89.) "The land became known as the 'Sheep Ranch Rancheria' and was held in trust for the Indians by the Federal government."  (*Id*. at p. 89.)

"In 1966, during a period in which the Federal government sought to terminate the Federal trust relationship with various Indian tribes, the BIA reached out to the Sheep Ranch Rancheria in order to distribute the assets of the Rancheria to its members as a

6

prelude to termination of the trust relationship. . . . The BIA discovered that the only

home on the Rancheria that remained occupied was that of Mabel Hodge Dixie,

presumably the granddaughter of Peter and Annize Hodge, who were identified in the

1915 census of the Sheepranch Indians. . . . The BIA determined that Mabel was the only

Indian entitled to receive the assets of the Rancheria, and she voted to accept the

distribution plan and was issued a deed to the land. . . . However, the BIA failed to take

the steps necessary to complete the termination of Sheep Ranch Rancheria." (*Jewell*,

*supra*, 5 F.Supp.3d at p. 89, citations omitted.)

"Mabel died in 1971. . . . A probate was ordered and the Administrative Law

Judge issued an Order of Determination of Heirs on October 1, 1971, reaffirmed by a

subsequent Order issued on April 14, 1993. . . . The Order listed the following

individuals as possessing a certain undivided interest in the Sheep Ranch Rancheria:

Merle Butler (Mabel's common law husband) and Mabel's four sons Richard Dixie,

Yakima Dixie, Melvin Dixie, and Tommy Dixie." (*Jewell*, *supra*, 5 F.Supp.3d at pp. 89-

90, citations omitted.)

Of Mabel's five heirs, by 1998, only Yakima and Melvin were still living. (*Jewell*,

*supra*, 5 F.Supp.3d at p. 90.)[6] In the 1990's Silvia Burley contacted the BIA for

information on her Indian heritage. (*Ibid*.) The BIA determined that Burley might be

---

6    To avoid confusion, we follow *Jewell*'s practice of referring to Yakima Dixie by
his first name, and we intend no disrespect by doing so.

7

remotely related to a prior member of the Sheep Ranch Rancheria and put her in contact with Yakima. (*Ibid*.)

In August 1998, Yakima purportedly signed a statement agreeing to enroll Burley; her two children, Rashel Reznor and Anjelica Paulk; and her granddaughter, Tristian Wallace, into the Tribe. (*Jewell*, *supra*, 5 F.Supp.3d at p. 90.) "The statement lists Yakima as 'spokesperson/Chairman of the Sheep Rancheria' but does not mention Melvin. . . . Nor does it describe what criteria, if any, Yakima used to determine whether Burley and her daughters/granddaughter were eligible for tribal membership." (*Ibid*., citations omitted.)

BIA representatives met with Yakima and Burley in September 1998, apparently to start the process of formally organizing the Tribe.[7] (*Jewell*, *supra*, 5 F.Supp.3d at p. 90.) The BIA followed up with a letter, which stated, "(1) the Tribe is 'held to the Order of the [probate] Administrative Law Judge' for 'purposes of determining the initial membership of the Tribe'; (2) Yakima and Melvin, as the only remaining heirs, 'are those persons possessing the right to initially organize the Tribe'; (3) because Yakima 'accepted Silvia Burley, Rashel Reznor, Anjelica Paulk, and Tristian Wallace as enrolled members of the Tribe,' these individuals, 'provided that they are at least eighteen years of age,' also 'possess the right to participate in the initial organization of the Tribe'; (4) Yakima and Burley were to 'consider what enrollment criteria should be applied to further prospective

---

[7] As we previously explained in our 2010 Opinion, an Indian tribe may organize itself under the procedures provided for in the Indian Reorganization Act of 1934 (25 U.S.C. § 461 et seq. (IRA)) with the assistance of the federal government.

8

members'; and (5) the BIA recommended, 'given the size of the Tribe,' that the Tribe 'operate as a General Council, which could elect or appoint a chairperson and conduct business.' " (*Id*. at pp. 90-91.)

"To that end, the BIA drafted Resolution # GC-98-01, which Yakima and Burley executed on November 5, 1998[,]" and which "states that the 'membership of the Tribe currently consists of at least the following individuals: [Yakima], Burley, Rashel, Anjelica, and Tristian; this membership may change in the future consistent with the Tribe's ratified constitution and any duly enacted Tribal membership statutes.' . . . It further states that Yakima, Burley, and Rashel, 'as a majority of the adult members of the Tribe, hereby establish a General Council to serve as the governing body of the Tribe.' " (*Jewell*, *supra*, 5 F.Supp.3d at p. 91, citations omitted.) "Rashel Reznor did not sign the Resolution. . . . In addition, the Resolution acknowledges that Melvin Dixie is a surviving heir to the Rancheria, but his whereabouts are 'unknown.' " (*Id*. at p. 91, fn. 6, citations omitted.)

"The next correspondence that the BIA received from the Tribe is a letter submitted by Burley dated April 20, 1999. . . . The letter is titled 'Formal notice of resignation' and states that Yakima 'resign[ed] as Chairperson of the Sheep Ranch Tribe.' Yakima claims that Burley forged his signature on the April 20, 1999 letter. . . . The very next day, on April 21, the BIA received a letter from Yakima in which he states 'I cannot and will not resign as chairman of the Sheep Ranch Indian Rancheria.' . . . However, the letter further states that Yakima 'give[s] [Burley] the right to act as a delegate to represent

9

the Sheepranch Indian Rancheria.' " (*Jewell*, *supra*, 5 F.Supp.3d at p. 91, citations omitted.)[8]

"On July 20, 1999, BIA and the Tribe entered into a 'self-determination contract' that provided annual funding for the development and organization of the Tribe for the benefit of future tribal members." (*Jewell*, *supra*, 5 F.Supp.3d at p. 91.) These federal funds are provided under the Indian Self-Determination and Education Assistance Act (Pub.L. No. 93-638, § 2 (Jan. 4, 1975) 88 Stat. 2230; see also 25 U.S.C. § 450). As in our previous opinions, we will refer to the BIA's provision of these federal funds under a contract with an Indian tribe as "ISDEAA benefits."

"Shortly thereafter, the leadership dispute that had been brewing between Yakima and Burley came to a head. Over the course of the next couple of years, both Yakima and Burley laid claim to the role of 'Chairperson' of the Tribe and attempted to organize the Tribe pursuant to the IRA by submitting multiple competing constitutions that purportedly had been adopted by the tribal membership." (*Jewell*, *supra*, 5 F.Supp.3d at p. 92.)

Between 1999 and 2005, Yakima and Burley continued to argue over tribal governance and membership — including a lawsuit and an administrative appeal filed by

---

[8]    In this appeal, the Tribe focuses on the issue of Yakima's resignation as chairperson in 1999, pointing to portions of Yakima's deposition in this case, during which Yakima stated that he resigned as tribal chairperson and that he signed a document setting forth his resignation. The Tribe argues that Yakima's deposition testimony is important new evidence that was not before the court in *Jewell*, establishing the Commission's duty to release the RSTF funds to Burley regardless of the ongoing federal proceedings involving the Tribe.

Yakima — but the BIA still provided ISDEAA benefits to the Tribe. (*Jewell*, *supra*, 5 F.Supp.3d at pp. 92-93.) Starting in 2000, the BIA indicated that if the Tribe did not internally resolve its leadership and membership dispute, the BIA would suspend the government-to-government relationship between the Tribe and the United States because of concerns about the lack of a duly constituted government. (*Ibid*.)

In 2004, the BIA rejected an alleged new tribal constitution submitted by Burley because "it did not appear that Burley had made any effort to include the whole tribal community" in the process. (*Jewell*, *supra*, 5 F.Supp.3d at p. 93.)

In a February 2005 letter, the BIA stated that "it did not recognize Burley as the tribal Chairperson, but rather, a 'person of authority' within the Tribe" and that " '[u]ntil such time as the Tribe has organized, the Federal government can recognize no one, including [Yakima], as the tribal Chairman.' . . . The BIA concluded by stating that it 'does not recognize any tribal government' for the Tribe '[i]n light of the BIA's [2004 Decision] that the Tribe is not an organized tribe.' " (*Jewell*, *supra*, 5 F.Supp.3d at pp. 93-94, citations omitted.) In July 2005, the BIA suspended the Tribe's contract for ISDEAA benefits. (*Jewell*, at p. 94.)

"On April 12, 2005, Burley, allegedly on behalf of the Tribe, filed suit in federal court in the District of Columbia, claiming that the BIA was interfering in the Tribe's internal affairs based on the BIA's refusal to recognize the Tribe as organized under the IRA." (*Jewell*, *supra*, 5 F.Supp.3d at p. 94, citing *California Valley Miwok Tribe v. United States* (D.D.C. 2006) 424 F.Supp.2d 197 (*California Valley Miwok I*).) The BIA "defended its refusal to recognize the Tribe as an organized tribe on the ground that the

11

Tribe had failed to take necessary steps to protect the interests of its potential members." (*Jewell*, at p. 94.) "The district court agreed with BIA and dismissed the complaint for failure to state a claim." (*Ibid.*, citing *California Valley Miwok I*, *supra*, 424 F.Supp.2d at p. 203.) Burley appealed to the United States Court of Appeals for the District of Columbia Circuit (hereafter D.C. Circuit), which affirmed the district court's decision. (*California Valley Miwok Tribe v. United States* (D.C. Cir. 2008) 515 F.3d 1262 (*California Valley Miwok II*).) The D.C. Circuit stated that the BIA has "the power to reject a proposed constitution that does not enjoy sufficient support from a tribe's membership" and noted that even though the Tribe "has a potential membership of 250, only Burley and her small group of supporters had a hand in adopting her proposed constitution." (*Id.* at p. 1267.) The D.C. Circuit took the view that Burley's "antimajoritarian gambit deserves no stamp of approval from the Secretary." (*Id.* at pp. 1267-1268.)

Meanwhile, the BIA concluded by November 2006 that " 'the ongoing leadership dispute [was] at an impasse and the likelihood of th[e] impasse changing soon [is] remote.' " (*Jewell*, *supra*, 5 F.Supp.3d at p. 94.) "Accordingly, the BIA, in a November 6, 2006 decision (hereinafter, the 'November 2006 Decision'), resolved to 'publish a notice of a general council meeting of the Tribe to be sponsored by the BIA in the newspapers within the Miwok region.' . . . The purpose of the notice was to 'initiate the reorganization process' by inviting 'the members of the Tribe and potential members to the meeting' to discuss 'the issues and needs confronting the Tribe.' " (*Ibid.*, citations omitted.)

12

Between 2006 and 2010, Burley initiated a series of administrative appeals of the November 2006 Decision at different levels of the BIA.  (*Jewell*, *supra*, 5 F.Supp.3d at pp. 94-95.)  The last and highest ranking official to consider Burley's administrative appeal was the Assistant Secretary – Indian Affairs for the United States Department of the Interior (the Assistant Secretary.)  In a December 2010 decision, the Assistant Secretary concluded that "there is no need for the BIA to continue its previous efforts to organize the Tribe's government, because it is organized as a General Council," and "there is no need for the BIA to continue its previous efforts to ensure that the Tribe confers tribal citizenship upon other individual Miwok Indians in the surrounding area" (the December 2010 Decision).  In the December 2010 Decision, the Assistant Secretary rescinded the BIA's previous statements refusing to recognize a government for the Tribe and refusing to recognize Burley as the tribal chairperson.  The Assistant Secretary indicated that the BIA would work with the Tribe's existing governing body to "fulfill" a government-to-government relationship.

In January 2011, on behalf of the "California Valley Miwok Tribe" and its tribal council, Yakima, along with Velma WhiteBear, Antonia Lopez, Antone Azevedo, Michael Mendibles and Evelyn Wilson, all of whom claim to be members or tribal council members of the tribe as led by Yakima (hereinafter, "the Yakima faction") filed a lawsuit in federal district court for the District of Columbia, challenging the Assistant Secretary's December 2010 Decision.  (*California Valley Miwok Tribe v. Jewell* (D.D.C.)

11-CV-00160 (BJR).)[9] Burley intervened in the litigation. (*Jewell*, *supra*, 5 F.Supp.3d at p. 88.)

In April 2011, after the federal lawsuit was already pending, the Assistant Secretary withdrew the December 2010 Decision, and on August 31, 2011, he issued a revised decision (the August 2011 Decision).[10] As *Jewell* describes, "The August 2011 Decision reached the following conclusions: (1) the Tribe is a federally recognized tribe; (2) the BIA cannot force the Tribe to organize under the IRA and will cease all efforts to do so absent a request from the Tribe; (3) the BIA cannot compel the Tribe to expand its membership and will cease all efforts to do so absent a request from the Tribe; (4) as of the date of the Decision, the Tribe's entire citizenship consists solely of Yakima, Burley, Burley's two daughters, and Burley's granddaughter; and (5) the November 1998 Resolution established a General Council comprised of all of the adult citizens of the Tribe, with whom BIA may conduct government-to-government relations." (*Jewell*, *supra*, 5 F.Supp.3d at p. 95.) The August 2011 Decision states, "This decision is final for

---

[9] A declaration filed in this action by WhiteBear describes the competing tribal government and membership recognized by the Yakima faction. According to WhiteBear, the "Tribe currently has over 200 adult members plus their children"; the "Tribe is governed by a Tribal Council, which currently consists of seven Council members"; and this competing tribal council to the one established by Burley "has met each month since 2003 to conduct Tribal business, enact resolutions, and perform other governmental functions."

[10] In connection with its motion for a new trial, the Tribe presented evidence that during the period before the December 2010 Decision was withdrawn, the BIA started the process of entering into a contract to provide ISDEAA benefits to the Tribe as represented by Burley.

the Department [of the Interior] and effective immediately, but implementation shall be stayed pending resolution of the litigation[,]" filed by the Yakima faction in federal district court.

The Yakima faction filed an amended complaint in federal district court to challenge the Assistant Secretary's August 2011 Decision, and the parties filed cross-motions for summary judgment. (*Jewell*, *supra*, 5 F.Supp.3d at p. 88.)

The federal district court ruled on the summary judgment motions, granting the motion filed by the Yakima faction, as reflected in the *Jewell* decision. *Jewell* held that "the Assistant Secretary erred when he assumed that the Tribe's membership is limited to five individuals and further assumed that the Tribe is governed by a duly constituted tribal council." (*Jewell*, *supra*, 5 F.Supp.3d at p. 88.) As *Jewell* explained, "the Assistant Secretary's conclusion that the citizenship of the Tribe consists solely of Yakima, Burley, Burley's two daughters, and Burley's granddaughter is unreasonable in light of the administrative record," as "the record is replete with evidence that the Tribe's membership is potentially significantly larger than just these five individuals." (*Id*. at p. 98.) Further, *Jewell* stated that there were "numerous factual allegations in the administrative record that raise significant doubts about the legitimacy of the [Tribe's] General Council" (*id.* at p. 100) and faulted the Assistant Secretary for "simply assum[ing], without addressing, the validity of the General Council." (*Id*. at p. 99.) Observing that "when the federal government engages in government-to-government relations with a tribe, it must ensure that it is dealing with a duly constituted government that represents the tribe as a whole" (*id*. at p. 97), *Jewell* concluded that the Assistant

15

Secretary had not carried out this obligation, and it accordingly remanded the matter to the Assistant Secretary to reconsider whether tribal membership had been properly limited to five persons and whether the Tribe's general council was a legitimate governing body. (*Id*. at pp. 99-100.)

Burley appealed *Jewell* to the D.C. Circuit, but then voluntarily dismissed the appeal in March 2014 after the United States Department of Justice took the position that the district court decision was not final for the purposes of appeal, as the disposition remanded the matter to the Assistant Secretary for reconsideration. As we understand the current status, the matter is now before the Assistant Secretary for reconsideration as directed by *Jewell*.

C.      *The Tribe's Lawsuit Against the Commission*

The Tribe, as represented by Burley, filed this action against the Commission in January 2008. Against the Commission, the operative complaint seeks (1) a writ of mandate under Code of Civil Procedure section 1085; (2) an injunction; and (3) declaratory relief. All three causes of action seek the same fundamental relief, namely an order requiring the Commission to pay over the RSTF funds to the Tribe, with Burley as its leader, to distribute according to her discretion. Specifically, all three causes of action present the common issue of whether, in carrying out its duty as a trustee of the RSTF, the Commission is legally justified in maintaining a policy of withholding the RSTF funds from the Tribe until the federal government establishes a government-to-government relationship with a tribal leadership body for the purpose of entering into a contract for ISDEAA benefits.

16

On December 17, 2010, the trial court granted the Yakima faction's motion for leave to intervene in this action.

The recent procedural history of this action has been influenced by developments in the federal proceedings. As relevant here, after the Assistant Secretary issued the December 2010 Decision, recognizing Burley as the tribal chairperson, the trial court (1) granted judgment on the pleadings in favor of the Tribe in March 2011, and (2) reconsidered and denied the Yakima faction's motion to intervene. However, when the Assistant Secretary set aside the December 2010 Decision, the trial court stayed its order granting judgment on the pleadings and its order reconsidering and denying the Yakima faction's motion to intervene. Later, after the Assistant Secretary issued the August 2011 Decision, the trial court denied a renewed motion for judgment on the pleadings filed by the Tribe and stayed all future proceedings on the merits, pending the resolution of the federal proceedings.

The Tribe filed a petition for a writ of mandamus, challenging the trial court's stay of proceedings, which we ruled upon in our 2012 Opinion, directing the trial court to lift the stay, allow the parties to file dispositive motions and, if necessary, proceed to trial. We explained that the pendency of the federal proceedings did not prevent the trial court from adjudicating this action, as the relief sought by the Tribe's complaint was a ruling determining whether the Commission had a duty to pay over the RSTF funds to the Tribe under the *present* circumstances, including the fact that the federal proceedings involving the Tribe's leadership and membership dispute were still ongoing.

17

After the stay was lifted in this action, three dispositive motions were filed: (1) the Tribe's motion for judgment on the pleadings; (2) the Commission's motion for summary judgment; and (3) the Yakima faction's motion for summary judgment.[11]

The trial court granted the Commission's motion for summary judgment. The trial court determined that "the Commission cannot reasonably be deemed to discharge its responsibility to make a[n] RSTF distribution to a tribe by making the payment to a person or group other than the one properly authorized to receive and administer the payment pursuant to a tribe's directives," and further that "[g]iven the BIA's authority with respect to the validity of tribal representatives, it is reasonable for the Commission to rely on the BIA for a determination of the authorized representative of a tribe for purposes of distribution of RSTF funds." As the trial court explained, "Since the BIA . . . has suspended its [ISDEEA benefit] payments to the . . . Tribe based on a leadership dispute, the court finds the Commission's suspension of disbursement of . . . RSTF payments, pending the BIA's resumption of [ISDEEA benefit] funding or other BIA action recognizing the authorized representative of the . . . Tribe, is justified."

The trial court also denied the Tribe's motion for judgment on the pleadings, incorporating its reasoning set forth in its ruling on the Commission's motion for

---

11  The Tribe also filed a motion seeking a reinstatement of the trial court's March 11, 2011 order reconsidering and denying the Yakima faction's motion to intervene. The Tribe acknowledged that the trial court had stayed its ruling reconsidering and denying the Yakima faction's motion to intervene after the Assistant Secretary withdrew his December 2010 Decision, but it argued — among other things — that our 2012 Opinion had the effect of lifting the stay on that order.

summary judgment.  The trial court did not rule on the Yakima faction's motion for summary judgment, concluding that it was moot in light of its ruling granting summary judgment in favor of the Commission.[12]

The Tribe then filed a motion for a new trial, which the trial court denied.  The Tribe appeals from the judgment.[13]

---

[12]    The trial court also denied the Tribe's motion seeking reinstatement of the order denying the Yakima faction's motion to intervene on the ground that the motion was moot in light of the summary judgment in favor of the Commission.  On appeal, the Tribe continues to advance the argument that the trial court's March 11, 2011 denial of the Yakima faction's motion to intervene is currently in force because it was not appealed, binding the Yakima faction to the trial court's statement in that order observing that the BIA had recognized Burley as an authorized tribal representative.  Based on the premise that the March 11, 2011 order is still effective as to the Yakima faction, the Tribe argues that the Commission should not be concerned about releasing the RSTF funds to the Tribe with Burley as the authorized tribal representative, because the Yakima faction will be barred from challenging the proposition that the BIA recognizes Burley as an authorized tribal representative.

Without even addressing the other flaws in the Tribe's argument, we reject it because its fundamental premise fails.  Regardless of whether the Yakima faction appealed the trial court's March 11, 2011 order, that order is no longer effective because the trial court stayed it and reinstated the Yakima faction as fully participating parties after the Assistant Secretary withdrew the December 2010 Decision.  Further, contrary to the Tribe's contention, our 2012 Opinion said nothing about lifting the trial court's stay on the March 11, 2011 order.  We lifted only the trial court's stay of future proceedings on the merits, not the trial court's stay of its prior orders.

[13]    Both the Commission and the Yakima faction have filed respondent's briefs in this action.  The Yakima faction has also filed a motion requesting that we strike or disregard portions of the Tribe's reply brief.  The Yakima faction correctly points out that (1) a large portion of the Tribe's reply brief discusses issues that were not raised in the opening brief, and (2) the reply brief cites numerous documents that were not submitted to the trial court in connection with the Commission's summary judgment motion, but that those documents appear in the clerk's transcript because they were submitted in connection with earlier motion practice in the trial court.  In response to the Yakima faction's motion to strike, we will not strike any portion of the reply brief, but we will disregard any arguments raised for the first time in the reply brief and any documents discussed in the

## II

## DISCUSSION

A.      *Standard of Review*

The Tribe's appeal challenges the trial court's ruling granting the Commission's motion for summary judgment.[14]  Code of Civil Procedure section 437c, subdivision (c) provides that summary judgment is to be granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law.[15]

---

reply brief that were not submitted in connection with the Commission's summary judgment motion.  (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 268 [instead of striking portion of a reply brief, the court "g[a]ve effect to defendants' motion [to strike improper portion of the reply brief] by disregarding issues or contentions raised for the first time in [the party's] reply brief"]; *Szadolci v. Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19 [in reviewing ruling on summary judgment, the "appellate court must examine only papers before the trial court when it considered the motion"].)

[14]      Although the Tribe states in its appellate brief that it is also challenging the trial court's rulings denying the Tribe's motion for a new trial and denying the Tribe's motion for judgment on the pleadings, the Tribe presents no substantive argument concerning those motions other than to incorporate its arguments challenging the ruling on the Commission's motion for summary judgment.  We therefore treat those points as waived and do not address them.  (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [" ' "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' "].)

[15]      A defendant "moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  A defendant may meet this burden either by showing that one or more elements of a cause of action cannot be established or by showing that there is a complete defense.  (*Ibid.*)
If the defendant's prima facie case is met, the burden shifts to the plaintiff to show the existence of a triable issue of material fact with respect to that cause of action or defense.  (*Aguilar*, *supra*, 25 Cal.4th at p. 849; *Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261.)  Ultimately, the moving party "bears the burden of persuasion that

We review a summary judgment ruling de novo to determine whether there is a triable issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.) "In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." (*Lenane v. Continental Maritime of San Diego, Inc.* (1998) 61 Cal.App.4th 1073, 1079.)

B.      *Summary Judgment Was Warranted in Favor of the Commission*

As we have explained, the fundamental issue for resolution posed by all three of the operative complaint's causes of action is whether, based on a dispute about the leadership and membership of the Tribe, the Commission is legally justified in holding the RSTF funds in trust for the Tribe until the federal government recognizes a tribal leader with which to conduct government-to-government relations for the purpose of entering into a contract for ISDEAA benefits.

For the sake of analyzing whether the Commission has established that it is entitled to summary judgment in its favor, that single question breaks down into three separate issues: (1) as a factual matter, does a leadership and membership dispute presently exist within the Tribe; (2) if so, is the Commission legally justified in withholding the payment of RSTF funds to the Tribe because of that dispute; and (3) is it reasonable under the circumstances for the Commission, as trustee of the RSTF funds, to

there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar*, at p. 850.)

21

take the position that it will resume distribution of RSTF funds to the Tribe when the federal government resumes contracting with the Tribe for ISDEAA benefits.

The trial court arrived at an affirmative answer to each of these three questions and accordingly determined that the Commission was entitled to summary judgment because under the undisputed facts there is no merit to the Tribe's claim that it is entitled to have the Commission release the RSTF funds to Burley as the tribal representative at this time.

Although the Tribe's appellate briefing is at times disorganized, most of the arguments that the Tribe raises in its appeal fall under one of the three issues we have identified above. We examine each issue in turn, addressing the Tribe's arguments as we proceed.

1. *A Tribal Leadership and Membership Dispute Currently Exists, Calling into Question Burley's Authority as a Legitimate Tribal Representative*

Although the Tribe attempts to convince us otherwise, the undisputed facts in the record establish that the Tribe is currently in the middle of a serious dispute over its leadership and membership. As our recitation of the tribal history set forth in *Jewell* demonstrates, the leadership and membership of the Tribe has been the subject of an internal tribal dispute since 1999 when Yakima wrote letters to the BIA stating that he would not resign as tribal chairman, alleging fraud and misconduct by Burley, and questioning whether he could exclude Burley and her family members from the Tribe. (*Jewell*, *supra*, 5 F.Supp.3d at pp. 91-92.)

Over the next 15 years, federal court decisions acknowledged the serious nature of the dispute and underscored the legitimacy of the Yakima faction's argument that Burley

22

might not be a proper tribal representative and that the tribal membership may be much larger than the five people claimed by Burley. For example, in 2008 the D.C. Circuit acknowledged the "ongoing leadership dispute between Burley and former tribal chairman Yakima Dixie" in which "[b]oth claim to represent the tribe . . ." (*California Valley Miwok II*, *supra*, 515 F.3d at p. 1263, fn. 1) and noted that although the Tribe "has a potential membership of 250" in an "antimajoritarian gambit," only "Burley and her small group of supporters had a hand in adopting her proposed constitution." (*Id*. at p. 1267). Most recently, in *Jewell*, the court stated that the factual record "is replete with evidence that the Tribe's membership is potentially significantly larger" and "raise[s] significant doubts about the legitimacy of the General Council." (*Jewell*, *supra*, 5 F.Supp.3d at pp. 98, 100.)

The dispute remains as active as ever, with the Yakima faction continuing to take an active role in the federal proceedings concerning the Tribe's leadership and membership as the plaintiff in the *Jewell* litigation. Further, the Yakima faction continues to actively participate in this case as an intervenor by filing its own summary judgment motion and filing an appellate brief in opposition to the Tribe's appeal, always taking a position challenging Burley's claim to be the legitimate tribal leader.

Despite strong evidence of a very active tribal dispute, the Tribe's appellate briefing argues that the Commission should be required to release the RSTF funds to Burley because there is no longer a serious dispute as to the legitimacy of Burley's leadership of the Tribe, based either on statements made by Yakima or on the actions of the BIA. As we will explain, neither contention has merit.

23

In support of its argument that there is no longer a dispute, the Tribe relies heavily on statements that Yakima made in a deposition in this action in 2012. During that deposition, Yakima testified that he signed a document in April 1999 resigning as tribal chairperson. The Tribe states that Yakima's deposition testimony is the same as if Yakima "simply gave up his false leadership dispute claim." According to the Tribe, Yakima's deposition testimony confirms that Burley is the person with authority to receive the RSTF funds. We reject the Tribe's argument.

Yakima's statement during his 2012 deposition, admitting that he signed a document in 1999 resigning as tribal chairperson, does not establish that the dispute over the Tribe's membership and leadership has been resolved. All of the evidence shows that ever since Yakima made the statement in 2012, the Yakima faction continues to be an active participant in the federal proceedings as well as in this case. Further, the issues surrounding the Tribe's leadership and membership dispute go far beyond the question of whether Yakima signed a document resigning as chairperson of the Tribe in 1999. As *Jewell* explains, the tribal membership may be much larger than five persons, and thus any representative elected only by a small subset of the potential tribal members may not be a legitimate leader. The resolution of that issue has little to do with whether Yakima voluntarily resigned as leader in 1999.[16]

---

[16] Further, as the Tribe recognizes, the impact of Yakima's deposition testimony has not yet been considered in the federal proceedings. The Tribe contends that if the BIA or the federal court considers Yakima's deposition testimony, the federal proceedings will conclude in favor of Burley. According to the Tribe, "once the matter is remanded and the administrative record is supplemented to include [Yakima's] sworn deposition

Next, the Tribe cites a variety of documents that purportedly establish that the BIA has resolved the leadership dispute in Burley's favor and has recognized Burley's authority as a tribal representative.

The first of these documents is a letter from the Assistant Secretary, dated November 28, 2011, addressing Burley as "Chairwoman" of the Tribe and inviting comment on proposed federal leasing regulations.[17] As we read this letter, it does not prove that the BIA currently considers the Tribe's leadership and membership dispute to be resolved. The content of the letter has nothing to do with tribal leadership issues. Moreover, it was addressed to Burley at a time when the Assistant Secretary had already issued the August 2011 Decision, in which he recognized Burley's government but stayed the implementation of the decision, and thus may simply represent the views expressed in the August 2011 Decision. Since that time, *Jewell* disapproved of the Assistant Secretary's August 2011 Decision and ordered that it be reconsidered. Thus, the Assistant Secretary's act of addressing Burley as "Chairwoman" of the Tribe in

_____

testimony . . . , upon reconsideration, the ASI will *likely* affirm his conclusion that the Tribe is validly governed by the Tribal Council." (Italics added.) In its reply brief, the Tribe also argues that as proceedings before the Assistant Secretary continue, another new document will be put forth, which will purportedly resolve another issue that caused concern to the court in *Jewell*, i.e., the absence of Reznor's signature on the 1998 resolution forming the Tribe's general council. The Tribe's argument about the ultimate impact that these evidentiary items will have in the federal proceedings is wholly speculative and underscores the fact that the dispute over the Tribe's leadership and membership is still very much active and unresolved.

[17] This document was submitted in connection with the Tribe's motion for a new trial.

25

November 2011 does not establish that the BIA currently views the Tribe's leadership and membership dispute to be resolved.[18]

The second document cited by the Tribe is a letter sent by the BIA on January 12, 2011, from Troy Burdick, the Superintendent of the BIA's Central California Agency, stating that in light of the Assistant Secretary's December 2010 Decision, the agency was "committed to working with the Tribe's existing governing body . . . to fulfill the government-to-government relationship between the United States and the [Tribe], consistent with the [Assistant Secretary's] direction."  The Tribe contends that the BIA's recognition of Burley's government in Burdick's January 12, 2011 letter has never been rescinded or revoked, establishing the BIA still recognizes Burley as the legitimate leader of the Tribe.  The argument has no merit.

The record is clear that in April 2011, the Assistant Secretary expressly "set aside" the December 2010 Decision, and in doing so, removed the basis for the BIA's recognition of Burley's government in the January 12, 2011 letter.  Further, to the extent any doubt existed as to whether the BIA currently recognizes Burley's leadership for the purpose of establishing a government-to-government relationship after the Assistant Secretary issued the August 2011 Decision, *Jewell* removed all doubt, as it concluded

---

[18]    The Tribe also relies on a December 2013 handwritten note to Burley from the current Assistant Secretary, addressing her as "Chairwoman" and thanking her for participating in the White House Tribal Nations Conference.  We have denied the Tribe's request to take judicial notice of that document.

that the Assistant Secretary erred in concluding that Burley's tribal government is legitimate.

In connection with its reliance on Burdick's January 12, 2011 letter, the Tribe repeatedly cites *Timbisha Shoshone Tribe v. Salazar* (D.C. Cir 2012) 678 F.3d 935, 937-938. In *Timbisha*, the court deferred to the BIA's recognition of a tribal government following a tribal election held to resolve a long-running tribal leadership dispute and held that a competing faction did not have standing to file suit on behalf of the tribe. (*Ibid*.) The Tribe argues that, similar to *Timbisha*, the BIA recognized Burley in the December 2010 Decision and the January 12, 2011 letter, and thus, in accordance with *Timbisha*, the Commission should follow the BIA's lead and recognize Burley's government. However, *Timbisha* is inapposite because, as we have explained, the tribal leadership dispute has *not* been resolved in this case and the BIA does *not* currently recognize a tribal government. The BIA briefly recognized Burley's government in the December 2010 Decision, but that decision is no longer effective because of subsequent events, including the Assistant Secretary's withdrawal of that decision and the federal court's remand of the matter in *Jewell*.[19]

---

[19] Although not warranting extensive discussion, we also point out that the Tribe attempts to parse the language of the Assistant Secretary's August 2011 Decision to argue that Burley is currently the legitimate tribal leader recognized by the BIA. Among other things, the Tribe argues that even though the Assistant Secretary stayed implementation of the August 2011 Decision, he meant the decision to have the present effect of recognizing Burley's government. This argument, and others like it based on the language of the August 2011 Decision, are foreclosed by *Jewell*, which disapproved the August 2011 Decision and remanded it for reconsideration by the Assistant Secretary.

27

Next, the Tribe argues that by continuing to publish the name of the Tribe in the Federal Register under the list of recognized Indian tribes, the BIA is indicating that it recognizes the legitimacy of Burley's tribal government. For this argument, the Tribe relies on the statement preceding the list that the "listed Indian entities are acknowledged to have the immunities and privileges available to federally recognized Indian tribes by virtue of their government-to-government relationship with the United States." The Tribe contends that if a government-to-government relationship exists with the federal government, "[t]he tribal government referred to in these official statements can only mean the Tribal Council identified in the ASI's August 31, 2011 decision headed by the Burley Faction." We disagree.

The Tribe has presented no evidence that merely by listing the name of the Tribe in the Federal Register, the BIA is recognizing the legitimacy of the tribal government that Burley claims to lead. Indeed, all of the evidence supports the opposite inference. As *Jewell* establishes, the BIA refused for a number of years to recognize Burley's government or to establish any government-to-government relationship with the Tribe as led by Burley. (*Jewell*, *supra*, 5 F.Supp.3d at pp. 94-95.) The list of recognized tribes is published annually in the Federal Register (25 U.S.C. § 479a-1(a)), and it is undisputed that the Tribe was consistently listed in each version of the Federal Register during that period. Based on these facts, there is no correlation between the appearance of the Tribe's name in the Federal Register and the BIA's recognition of a specific tribal government.

28

Finally, the Tribe relies on the fact that the BIA continues to recognize a tribal name change made in 2001 when Burley was the tribal chairperson, changing the name of the Tribe from the "Sheep Ranch Rancheria of Me-Wuk Indians of California" to the "California Valley Miwok Tribe." The Tribe argues that if the BIA continued to dispute the legitimacy of Burley's leadership, it would not continue to recognize the tribal name change made when Burley was chairperson. We reject this argument. The name change was made in 2001, during a period when the BIA still recognized Burley's government and provided ISDEAA benefits to the Tribe. (*Jewell*, *supra*, 5 F.Supp.3d at pp. 92-93.) The BIA did not withdraw recognition of Burley's government until 2005. (*Id*. at p. 93.) In light of the evidence disclosing an ongoing leadership and membership dispute within the Tribe as acknowledged and detailed in *Jewell*, it would be illogical to conclude that the BIA considers that dispute resolved and currently recognizes the legitimacy of Burley's leadership merely because it recognizes a tribal name change made in 2001 when it recognized Burley's government.

In sum, the Commission met its burden to establish that there is no triable issue of material fact on the central factual issue presented in this case, i.e., whether the Tribe is currently in the middle of an unresolved dispute over its leadership and membership.

2. *The Commission Is Justified in Withholding RSTF Funds in Light of the Tribal Membership and Leadership Dispute*

Having determined that a current leadership and membership dispute within the Tribe calls into question whether Burley is an authorized representative of a legitimate tribal government, we turn to the next issue, which is purely a legal question.

29

Specifically, we consider whether, as a matter of law, the Commission may legally refrain from distributing the RSTF funds to the Tribe in light of the current tribal leadership and membership dispute.

We begin our analysis with the language of the controlling statute and the Compacts. As we have explained, the Government Code establishes the basic duty of the Commission with respect to the RSTF funds. Specifically, the Commission "shall make quarterly payments from the Indian Gaming Revenue Sharing Trust Fund to each eligible recipient Indian tribe within 45 days of the end of each fiscal quarter." (Gov. Code, § 12012.90, subd. (e)(2).) The Compacts further define the Commission's duties. "The Commission shall serve as the trustee of the fund. The Commission shall have no discretion with respect to the use or disbursement of the trust funds. Its sole authority shall be to serve as a depository of the trust funds and to disburse them on a quarterly basis to Non-Compact Tribes." (Compacts, § 4.3.2.1(b).)[20]

From these provisions, it is clear that the Commission has a very limited role with respect to the RSTF funds. Specifically, the Commission, in its role as a trustee, is to serve as a depository of the funds and disburse them on a quarterly basis. It is also clear, however, that in order to disburse funds, the Commission must identify a tribal representative to whom it can release the funds.

---

[20] The Government Code incorporates the provisions of the Compacts that describe the role of the Commission with respect to the RSTF funds, as the Government Code states that the RSTF funds "shall be available to the [Commission] . . . for the purpose of making distributions to noncompact tribes, in accordance with distribution plans specified in tribal-state gaming compacts." (Gov. Code, § 12012.75.)

30

In this case, the Commission is faced with an impossible situation in trying to identify a tribal representative to whom the RSTF funds can be released. Burley claims to be the authorized tribal representative pursuant to a tribal government created by five tribal members. The Yakima faction opposes Burley's claim to be the authorized tribal representative and has formed a rival tribal government, allegedly representing a much larger population of tribal members. Both factions claim that their tribal council is the sole legitimate tribal government, and that their leaders are the authorized tribal representatives. Under these circumstances, it is impossible for the Commission to carry out its role, as defined by statute and the Compacts, to distribute the RSTF funds to the tribe known as the "California Valley Miwok Tribe."

The Compacts state that Commission "shall serve as the trustee" of the RSTF funds. Therefore, the provisions of the Probate Code dealing with the duties of trustees are applicable here in understanding the proper role of the Commission. (Prob. Code, § 15000 et seq.) Under the Probate Code, a trustee has the duty to "take reasonable steps under the circumstances to take and keep control of and to preserve the trust property." (*Id.*, § 16006.) Further, consistent with that duty, the Probate Code recognizes the right of a trustee to "[w]ithhold any portion of an otherwise required distribution that is reasonably in dispute." (*Id.*, § 16004.5, subd. (b)(4); see also *Bellows v. Bellows* (2011) 196 Cal.App.4th 505, 511 (*Bellows*) ["[Probate Code, section 16004.5, s]ubdivision (b)(4) confirms the right of the trustee to withhold any distribution that is

31

reasonably in dispute."].)[21]  Indeed, "it is a fraud upon the beneficiary for a trustee to transfer trust property to another without protection and in violation of the beneficiary's right."  (*Dougherty v. California Kettleman Oil Royalties* (1939) 13 Cal.2d 174; see also Rest.2d, Trusts § 226 ["If by the terms of the trust it is the duty of the trustee to pay or convey the trust property or any part thereof to a beneficiary, he is liable if he pays or conveys to a person who is neither the beneficiary nor one to whom the beneficiary or the court has authorized him to make such payment or conveyance."].)

Here, in light of the fact that two different tribal factions claim the right to receive the RSTF funds and that dispute has been recognized and documented by both the BIA and the federal courts, the distribution of the RSTF funds is "reasonably in dispute," giving the Commission the right to withhold those funds.  (Prob. Code, § 16004.5, subd. (b)(4).)  Although the Compacts and the Government Code require that the Commission make a distribution to the Non-Compact Tribes on a quarterly basis, the Commission also has a duty as a trustee to "take reasonable steps under the circumstances to take and keep

---

[21]    When a dispute about distribution of trust funds arises, "[i]n such a case . . . , the trustee may seek instructions from the court, the well-established method of resolving controversies that may arise between trustee and beneficiary."  (*Bellows*, *supra*, 196 Cal.App.4th at p. 511.)  We note that the Commission properly attempted to follow this approach when it filed an interpleader action in 2005 seeking a court order as to how it should handle the distribution of the RSTF funds in light of the tribal leadership and membership dispute.  However, the court granted Burley's demurrer to the interpleader action on the ground, among others, that it did not have jurisdiction to resolve the internal tribal dispute.  Unable to obtain court guidance on the RSTF funds, the Commission adopted its current approach of withholding the funds until the tribal dispute is resolved.  Although this litigation was initiated by the Tribe, in ruling on the instant dispute we are in effect affording the relief available under the Probate Code to provide instructions to a trustee to resolve a dispute about the distribution of trust funds.

control of and to preserve the trust property." (Prob. Code, § 16006.) Under the circumstances, the Commission's duty as a trustee takes precedence, allowing it to withhold the RSTF funds from the Tribe until it can identify an authorized tribal representative to receive the funds and it can assure itself that it is not distributing the funds to the wrong person or group.

The Tribe argues that the Commission is not authorized to withhold the RSTF funds because the Compacts state that the Commission "shall have no discretion with respect to the use or disbursement of the trust funds." (Compacts, § 4.3.2.1(b).) According to the Tribe, in deciding to withhold the RSTF funds from the Tribe instead of distributing those funds, the Commission is improperly exercising discretion. We disagree. Indeed, the opposite is true. Due to the leadership and membership dispute, there is currently no individual the Commission can identify as the authorized tribal representative to receive the RSTF funds. If the Commission were to choose between the two competing tribal factions and determine for itself who has a meritorious claim to be the legitimate tribal representative, the Commission would be impermissibly exercising its *discretion* and would be overstepping, by far, its very circumscribed role. The Commission has no authority, either under the Compacts or the Government Code, to resolve intratribal disputes over membership and leadership.

3. *The Commission Is Reasonably Withholding RSTF Funds from the Tribe Until the BIA Resumes Contracting with the Tribe for ISDEAA Benefits*

The Commission has taken the position that it "will disburse the accrued RSTF payments to the [Tribe] once the BIA identifies the [Tribe's] authorized leadership as

33

evidence by the resumption of [ISDEAA benefits] contracting." The final issue presented by the Commission's summary judgment motion is whether that position is reasonable.

As a trustee, the Commission is required to take a reasonable approach, under the circumstances, in deciding whether the tribal leadership and membership dispute has been resolved such that it may resume distribution of the RSTF funds. The reasonableness standard is found in two of the applicable provisions of the Probate Code. First, as we have explained, a trustee must "take *reasonable steps under the circumstances* to take and keep control of and to preserve the trust property" (Prob. Code, § 16006, italics added). Second, a trustee has the right to "[w]ithhold any portion of an otherwise required distribution that is *reasonably* in dispute." (*Id*., § 16004.5, subd. (b)(4), italics added.) Based on these provisions, we examine whether it is reasonable, under the circumstances, for the Commission to withhold the RSTF funds until the BIA resumes contracting with the Tribe for ISDEAA benefits.[22]

---

[22]    The Tribe argues that the Commission is not entitled to any special deference in its approach to the RSTF funds based on the general policy of giving deference to an administrative agency's construction and interpretation of a statute it is charged with administering. (*Sheet Metal Workers' International Association, Local 104 v. Duncan* (2014) 229 Cal.App.4th. 192, 207 ["Although the ultimate responsibility for the construction of a statute rests with the court, we accord great weight and respect to the construction of the statute by the agency charged with administering the statute[,]" and "[d]eference to an administrative agency's interpretation is situational and depends on a complex of factors"].) We need not decide that issue, as even without affording any special deference to the Commission's approach based on its role as a governmental agency, we apply the reasonableness standard applicable to trustees in dealing with trust funds.

Here, the Commission may reasonably look to the status of the BIA's relationship with the Tribe to understand whether the intratribal leadership and membership dispute has been resolved and an authorized tribal representative has been identified. As *Jewell* explains, the federal government has a unique role in determining the proper representatives of a tribal government for purposes of engaging in a government-to-government relationship with the tribe. Specifically, "the federal government has a 'distinctive obligation of trust' in its dealings with Indians." (*Jewell*, *supra*, 5 F.Supp.3d at p. 97.) Thus, "when the federal government engages in government-to-government relations with a tribe, it must ensure that it is dealing with a duly constituted government that represents the tribe as a whole." (*Ibid*.) The BIA has a responsibility to "deal[] only with a tribal government that actually represents the members of a tribe." (*California Valley Miwok I*, *supra*, 424 F.Supp.2d at p. 201.)

The federal government's trust obligation toward Indian tribes features prominently in the BIA's current dealings with the Tribe. Because of the impossibility of identifying a duly constituted tribal government and authorized tribal representative, the BIA suspended its contracting for ISDEAA benefits with the Tribe. (*Jewell*, *supra*, 5 F.Supp.3d at pp. 93-94.) The proceedings underway upon remand to the Assistant Secretary center on whether the BIA will recognize a tribal government, which represents the Tribe as a whole. Given the BIA's obligation to ensure that it is dealing with a tribe's duly constituted government, if the BIA chooses to resume contracting for ISDEAA benefits with the Tribe, the Commission will be justified in viewing that action by the BIA as a decision that the Tribe has a duly constituted government and an authorized

35

tribal representative. The Commission has therefore taken a reasonable approach in looking to the status of the BIA's relationship with the Tribe to determine when an authorized tribal representative exists to receive the RSTF funds.

The Tribe argues that because ISDEAA benefits and RSTF funds are significantly different, the Commission should not look to whether the BIA has resumed contracting for ISDEAA benefits with the Tribe to decide whether an authorized tribal representative exists to receive the RSTF funds. As the Tribe points out, the Commission is required to distribute RSTF funds on a nondiscretionary basis to *all* Non-Compact Tribes, while, in contrast, under the ISDEAA the BIA may refuse to award a contract for ISDEAA benefits to a tribe for a variety of reasons. (25 U.S.C. § 450f(a)(2).)[23]

As the Commission acknowledges, there are many differences between the RSTF funds and the ISDEAA benefits, and there are a variety of reasons that might cause the BIA to refuse to provide ISDEAA benefits. However, the Commission clarifies that it does not withhold RSTF funds from a tribe simply because that tribe is not awarded a

---

[23] The BIA may refuse to award a contract for ISDEAA benefits based on "a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that-- [¶] (A) the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory; [¶] (B) adequate protection of trust resources is not assured; [¶] (C) the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract; [¶] (D) the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, . . . ; or [¶] (E) the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor." (25 U.S.C. § 450f(a)(2).)

contract for ISDEAA benefits. Instead, in the unique situation here, the BIA's decision to suspend ISDEAA benefits to the Tribe was because of a tribal membership and leadership dispute that made it impossible for the BIA to enter into a government-to-government relationship with a legitimate tribal government and authorized tribal representative to contract for ISDEAA benefits. This is the same problem faced by the Commission with respect to the RSTF funds, as it cannot identify an authorized tribal representative to receive the funds.

Thus, although the BIA may refuse to provide ISDEAA benefits for a variety of reasons, *in this case* the BIA's refusal was caused by uncertainty as to the Tribe's authorized leadership. Therefore, the BIA's resumption of contracting for ISDEAA benefits with the Tribe will establish that an authorized leader exists to receive funds on behalf of the Tribe. At that point, the proper party to receive the distribution of the RSTF funds will no longer be "reasonably in dispute" (Prob. Code, § 16004.5, subd. (b)(4)), and the Commission will accordingly have a duty under the Compacts and the Government Code to distribute the RSTF funds to the Tribe.

4.      *The Tribe's Remaining Arguments Lack Merit*

Before concluding our analysis, we address two additional arguments that the Tribe presents in its appeal.

a.      *There Is No Merit to the Argument That the Commission Should Distribute the RSTF Funds to the Five Tribal Members Claimed by Burley Based on a Purported Vested Right to Distribution*

Although not a focus of its argument in the trial court, on appeal the Tribe contends that regardless of the eventual outcome of the tribal membership and leadership

37

dispute, the five tribal members that Burley claims to currently constitute the Tribe have a vested interest in receiving the RSTF funds that accumulated while the tribal leadership and membership dispute was pending.[24] The Tribe argues that any future tribal members are currently only *potential* members who have no right to RSTF funds accumulated before they became tribal members. Based on this premise, the Tribe argues that the Commission should be ordered to release the currently accumulated RSTF funds to the five tribal members claimed by Burley to constitute the Tribe. As we will explain, we reject this argument because it ignores the nature of the current tribal and membership dispute as described in *Jewell*.

The Tribe's assumption that the current tribal membership is, without question, limited to five persons is not supported by the record. One of the two items that *Jewell* remanded to the Assistant Secretary is the issue of whether the Tribe's *current* membership is properly limited to only five persons or, in contrast, whether the Tribe has a current membership of over 200 as claimed by the Yakima faction. As *Jewell*

---

24    The Tribe argues that the right to receive the RSTF funds is "vested" in current tribal members or the tribal members have "constructively received" the funds because the Commission purportedly already "distributed" the RSTF funds to the Tribe by placing those funds for the benefit of the Tribe in an interest-bearing account. There is no factual support in the record for the claim that the Commission has "distributed" the RSTF funds. Indeed, the Tribe filed this litigation because the Commission decided *not* to distribute the RSTF funds to the Tribe, and instead to fulfill its duty as a trustee by *withholding* the RSTF funds from the Tribe until it can identify an authorized tribal representative. The most that can be said is that the Commission has set aside designated funds for the Tribe. However, the Commission has consistently taken the position that it is unable to identify any specific tribal members or any authorized tribal representative to whom those funds should be distributed.

38

explained, the Assistant Secretary was unreasonable to conclude that the Tribe's membership is limited to five persons, as "the record is replete with evidence" of a potentially much larger tribal membership. (*Jewell*, *supra*, 5 F.Supp.3d at p. 98.) Indeed *Jewell* specifically rejected the same type of assertion that the Tribe makes in this case, explaining that "a distinction between citizens and 'potential' citizens of the Tribe" incorrectly "assumes that the five citizens . . . have the exclusive authority to determine citizenship" and is a "circular argument." (*Id.* at p. 98, fn. 14.)

In addition, as we have pointed out, the Compacts establish that the Commission "shall have no discretion *with respect to the use or disbursement of the trust funds*." (Compacts, § 4.3.2.1(b), italics added.) Accordingly, it is not the role of the Commission, nor of this court in ruling on the scope of the Commission's duty with respect to the RSTF funds, to determine how the RSTF funds should be distributed *within* the Tribe once the internal tribal dispute is resolved and the Commission identifies an authorized tribal representative to receive the accumulated RSTF funds on behalf of the Tribe.

        b.     *The Tribe Is Not Entitled to a Distribution of RSTF Funds Based on the Assistant Secretary's Brief Recognition of Burley's Leadership from December 2010 to April 2011*

Next, the Tribe focuses on the brief period from December 22, 2010, to April 1, 2011, when the Assistant Secretary's December 2010 Decision was in effect and the BIA was taking steps to implement it by starting the process of entering into a contract for ISDEAA benefits with the Tribe as represented by Burley. According to the Tribe, because Burley was recognized by the BIA for a short time as an authorized tribal

representative, the Commission should be required to distribute to Burley the RSTF funds accumulated between 2005 and April 2011.[25]  We find no merit to this argument.

The Assistant Secretary's issuance and withdrawal of the December 2010 Decision establishes nothing more than that there was a brief window during which it appeared that the tribal membership and leadership dispute might have been resolved to the satisfaction of the BIA.  However, as subsequent events show, the December 2010 Decision did not end up resolving the dispute, which is still very active and is once again before the Assistant Secretary.  Accordingly, the Commission properly continues to withhold the

---

[25]      The Tribe argues that *Goodface v. Grassrope* (8th Cir. 1983) 708 F.2d 335 establishes a rule that the last recognized leader of a tribe is to be dealt with pending resolution of a dispute.  According to the Tribe, as Burley was the last leader recognized by the BIA — either until 2005 or in the December 2010 Decision — the Commission should follow *Goodface* and deal with Burley for the purposes of distributing the RSTF funds.  We reject the Tribe's argument because *Goodface* does not establish the rule for which the Tribe cites it.  *Goodface* concerned a specific situation in which the BIA was already dealing with an Indian tribe in a government-to-government relationship and providing needed federal benefits to the reservation when a tribal election dispute arose involving improprieties during the election process, calling into question whether the new tribal council was the legitimate tribal government or whether the old tribal council should stay in place until a new election could be called.  (*Id*. at p. 337.)  *Goodface* held that the BIA erred by refusing to recognize either government because the BIA was "obligated to recognize and deal with some tribal governing body" so that it did not jeopardize the continuation of necessary day-to-day services on the reservation.  (*Id.* at p. 339.)  Based on "equitable principles," *Goodface* concluded that the BIA should deal with the tribal council that had been certified and sworn in after the tribal election.  (*Ibid*.)  It is clear from *Goodface*'s discussion that it did not purport to establish a rule applicable to all situations.  The decision was reached on pragmatic and equitable grounds.  Here, the situation is vastly different, with a wide-ranging dispute over the Tribe's membership and leadership rather than an isolated dispute over election improprieties by a well-established tribe with a long-standing relationship with the BIA.  Under the present circumstances, there are ample grounds for the Commission to withhold RSTF benefits from the Tribe until the dispute is resolved.

RSTF funds because it cannot identify an undisputed authorized tribal representative to receive the funds.

## DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:


NARES, Acting P. J.


McINTYRE, J.