Filed 6/23/23; Certified for Publication 7/10/23 (order attached)

COURT OF APPEAL FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MANUEL CORRALES, JR., | D080288 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2019-00019079-CU-MC-CTL) |
| CALIFORNIA GAMBLING CONTROL COMMISSION et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald F. Frazier, Judge. Affirmed.

Manuel Corrales, Jr., in pro. per., for Plaintiff and Appellant.

Rob Bonta, Attorney General, Sara J. Drake, Assistant Attorney General, T. Michelle Laird, Noel A. Fischer and James G. Waian, Deputy Attorneys General, for Defendant and Respondent California Gambling Control Commission.

Peebles Kidder Bergin & Robinson, Curtis Vandermolen and Tim Hennessy for Defendant and Respondent California Valley Miwok Tribe (Burley Administration).

Morgan, Lewis & Bockius, Colin C. West, Ella Gannon Foley and Thomas F. Gede for Interveners and Respondents Michael Mendibles, Marie Diane Aranda, Rosalie Ann Russell, Christopher Jason Russell and Lisa Fontanilla.

In six previous opinions we have addressed issues arising from litigation caused by the ongoing leadership and membership dispute of the California Valley Miwok Tribe (the Tribe).[1] Most of our prior opinions related to the money in the Indian Gaming Revenue Sharing Trust Fund (RSTF) that the Tribe is entitled to receive on a quarterly basis.

Among other things, we previously determined that the California Gambling Control Commission (the Commission) is entitled to hold the Tribe's RSTF money in trust, rather than releasing it to the Tribe, until the Tribe's leadership and membership dispute is settled and the Commission is able to identify a tribal representative to receive the funds. (*CVMT 2014, supra,* 231 Cal.App.4th 885.) Specifically, we approved of the Commission's decision to withhold the RSTF money from the Tribe until the federal Bureau of Indian Affairs (BIA) signals that it believes the tribal membership and leadership dispute has been resolved by establishing a government-to-government relationship with a tribal leadership body for the purpose of

---

[1]     Our previous opinions arising from the Tribe's leadership dispute are as follows: *California Valley Miwok Tribe v. California Gambling Control Com.* (Apr. 16, 2010, D054912) [nonpub. opn.]; *California Valley Miwok Tribe v. Superior Court* (Dec. 18, 2012, D061811) [nonpub. opn.]; *California Valley Miwok Tribe v. California Gambling Control Com.* (2014) 231 Cal.App.4th 885 (*CVMT 2014*); *California Valley Miwok Tribe v. California Gambling Control Com.* (June 16, 2016, D068909) [nonpub. opn.]; *California Valley Miwok Tribe v. Everone* (July 16, 2018, D072141) [nonpub. opn.]; *California Valley Miwok Tribe v. California Gambling Control Com.* (Jan. 29, 2020, D074339) [nonpub. opn.] (*CVMT 2020*).

entering into a contract for benefits under the Indian Self-Determination and Education Assistance Act of 1975 (25 U.S.C. § 5301 et seq.; ISDEAA), otherwise known as a 638 contract.[2]

In our most recent opinion, *CVMT 2020*, we affirmed, on res judicata grounds, the dismissal of a lawsuit filed by attorney Manuel Corrales, Jr. against the Commission on behalf of his then-client, a competing faction of the Tribe led by Silvia Burley (the Burley faction).  (*CVMT 2020*, *supra*, D074339.)[3]  We also imposed sanctions on Corrales for his frivolous appeal, in that he continued to seek release of the RSTF money to the Burley faction, even though the tribal membership and leadership dispute was not resolved and the BIA had not established a government-to-government relationship with a tribal leadership body as described in *CVMT 2014*.  (*Ibid.*)

The lawsuit giving rise to this appeal was brought by Corrales, *on behalf of himself*, against the Commission and the two competing factions of the Tribe, including his former client, the Burley faction.  Through this lawsuit, Corrales seeks to ensure that he receives payment from the Tribe for the attorney fees that he claims he is due under a fee agreement he entered into with the Burley faction in 2007.  Specifically, even though the Tribe's leadership dispute is still not resolved, Corrales seeks either (1) an order requiring the Commission to make immediate payment to him from the Tribe's RSTF money, or (2) an order that when the Commission eventually

---

[2]    A contract for benefits under the ISDEAA is commonly referred to as a "638 contract," based on the public law number of the ISDEAA.  (*Shirk v. U.S. ex rel. Dept. of Interior* (9th Cir. 2014) 773 F.3d 999, 1002 [citing Pub. L. No. 93-638, 88 Stat. 2203 (Jan. 4, 1975)].)

[3]    In *CVMT 2020*, we identified the members of the Burley faction as Silvia Burley, Rashel Reznor, Anjelica Paulk, and Tristian Wallace.  (*CVMT 2020*, *supra*, D074339.)

decides to release the RSTF money to the Tribe, his attorney fees must be paid directly to him by the Commission before the remainder of the funds are released to the Tribe.

The trial court dismissed Corrales's lawsuit because the question of whether Burley represented the Tribe in 2007 for the purpose of entering into a binding fee agreement with Corrales on behalf of the Tribe requires the resolution of an internal tribal leadership and membership dispute, over which the courts lack subject matter jurisdiction. After judgment was entered, Corrales brought a motion for a new trial and a motion for relief from default. Among other things, Corrales argued that the trial court should have stayed his lawsuit rather than dismissing it.

On appeal, Corrales contends that his lawsuit can be resolved without deciding an internal tribal leadership and membership dispute that would divest the court of subject matter jurisdiction. Relying on the doctrine of "ostensible authority," Corrales argues that the BIA conferred ostensible authority on Burley to enter into the fee agreement with Corrales on behalf of the Tribe, regardless of how the Tribe itself eventually resolves the ongoing leadership and membership dispute. As we will explain, the argument fails because it misunderstands both the role of the BIA and the doctrine of ostensible authority. Corrales also contends that the trial court "abused its discretion" in denying a stay. That argument lacks merit because Corrales did not seek a stay in opposing the motion to dismiss. In fact, earlier in the litigation, Corrales filed and then *withdrew* an ex parte motion to stay the action, after which he subjected the parties to two more years of litigation. The trial court cannot have abused its discretion in failing to grant relief that Corrales did not seek. Finally, Corrales challenges the trial court's denial of

4

his postjudgment motions, but he presents no meritorious argument in support of that contention.  We accordingly affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Relevant Factual Background*

In previous opinions we explained the history of the Tribe and its long-running leadership and membership dispute, which has resulted in numerous proceedings in state courts, federal courts, and administrative agencies.  (*CVMT 2014, supra,* 231 Cal.App.4th at pp. 890-896; *CVMT 2020, supra,* D074339.)  We refer the reader to our prior opinions for a detailed discussion.

The appeal presently before us concerns the dismissal of a first amended complaint filed by Corrales.  In that complaint, Corrales presented a truncated history of the Tribe's leadership dispute, which for the most part tracks the history set forth in our previous opinions.  It is undisputed that the tribal leadership dispute originated when Yakima Dixie and Burley both claimed to be the rightful chairperson of the Tribe.  As we described in *CVMT 2014,* "Between 1999 and 2005, [Dixie] and Burley continued to argue over tribal governance and membership—including a lawsuit and an administrative appeal filed by [Dixie]—but the BIA still provided ISDEAA benefits to the Tribe.  [Citation.]  Starting in 2000, the BIA indicated that if the Tribe did not internally resolve its leadership and membership dispute, the BIA would suspend the government-to-government relationship between the Tribe and the United States because of concerns about the lack of a duly constituted government.  [Citation.]  [¶]  In 2004, the BIA rejected an alleged new tribal constitution submitted by Burley because 'it did not appear that Burley had made any effort to include the whole tribal community . . . ' in the process.  [Citation.]  [¶]  In a February 2005 letter, the BIA stated that 'it did

5

not recognize Burley as the tribal Chairperson, but rather, a "person of authority" within the Tribe' and that ' "[u]ntil such time as the Tribe has organized, the Federal government can recognize no one, including [Dixie], as the tribal Chairman." . . . The BIA concluded by stating that it "does not recognize any tribal government" for the Tribe "[i]n light of the BIA's [March 2004 Decision] that the Tribe is not an organized tribe." ' [Citation.] In July 2005, the BIA suspended the Tribe's contract for ISDEAA benefits." (*CVMT 2014*, *supra*, 231 Cal.App.4th at pp. 892-893.)

Since 2005, there have been almost two decades of court battles, federal administrative proceedings, and attempts to identify tribal members and put in place a tribal governing body. Our most up-to-date description of those proceedings is in *CVMT 2020*. As the parties confirmed during oral argument, as of the present day, the Tribe's leadership and membership dispute is still not resolved, and the BIA has not entered into a government-to-government relationship with the Tribe.

We have also previously explained that as a non-gaming tribe in California, the Tribe is entitled to annual payments of $1.1 million described in the tribal-state gaming compacts that the State of California has entered into with gaming tribes. (*CVMT 2014*, *supra*, 231 Cal.App.4th at pp. 888-889.) The annual payment is drawn from the licensing fees paid by gaming tribes that are deposited into the RSTF. (*Id*. at p. 889.) The Commission administers the RSTF, serves as its trustee, and is responsible for making quarterly disbursements from the RSTF to the tribes that operate fewer than a specific number of gaming devices. (*Ibid*.; see also Gov. Code, § 12012.90 [setting forth the Commission's role with respect to the RSTF].)

As we explained in *CVMT 2014*, "[S]tarting in 2005, the Commission, acting as trustee of the RSTF, suspended its quarterly disbursements to the

6

Tribe and decided to hold the funds indefinitely in trust for the Tribe for later distribution. The Commission began withholding the distribution of the RSTF funds to the Tribe when it became aware of a dispute over the [T]ribe's membership and leadership as evidenced by ongoing proceedings and litigation involving the BIA's relationship with the Tribe." (*CVMT 2014*, *supra*, 231 Cal.App.4th at p. 889.) Specifically, the Commission "suspended its disbursement of the RSTF funds to the Tribe 'pending [the] BIA's recognition of an authorized . . . Tribe leader or leadership group with which to conduct its government[-]to[-]government business.' " (*Id.* at p. 890.)

Corrales was retained by Burley in 2007 to attempt to obtain the release of the RSTF money that the Commission was withholding from the Tribe. In his operative first amended complaint in this action, Corrales alleges that "[o]n December 13, 2007, [the Tribe] hired Corrales to represent it to recover RSTF money the Commission has been withholding from the Tribe since August 2005, and to that end entered into a valid fee agreement with Corrales." Specifically, "[t]he fee agreement Corrales entered into with [the Tribe] in 2007 was signed by Burley as the authorized representative of the Tribe" (the Fee Agreement). As alleged by Corrales, "The parties subsequently revised the fee agreement on March 10, 2009. The fee agreement provides that Corrales will be paid 20% of the RSTF money ultimately released to [the Tribe] as payment for his legal services, including costs and expenses of litigation." Corrales also alleges that "[a]t that time [the Tribe] entered into a fee agreement with Corrales in 2007, the Tribe was involved in a Tribal leadership dispute with its former Chairman, Yakima Dixie . . . , who claimed he had not resigned, but that his resignation was a complete forgery. The dispute was between Dixie and the then current and recognized Tribal Chairperson, Silvia Burley."

7

As the first amended complaint describes, Corrales "has been involved in litigation for the Tribe since 2007 against various parties . . . in order to effectuate the release of the RSTF money to the Tribe." Indeed, Corrales has represented the Burley faction in the litigation that gave rise to all of our previous opinions involving the Tribe. In that litigation, Corrales did not succeed in obtaining the release of the RSTF money on behalf of the Burley faction of the Tribe. Specifically, in two successive lawsuits filed by Corrales against the Commission on behalf of the Burley faction, we explained that the Commission is entitled to continue to withhold the RSTF money until the BIA establishes a government-to-government relationship with a tribal leadership body for the purpose of entering into a contract for ISDEAA benefits, otherwise known as 638 contracts. (*CVMT 2014, supra,* 231 Cal.App.4th at p. 908; *CVMT 2020, supra,* D074339.) We also imposed sanctions on Corrales in the second of those lawsuits for filing an objectively frivolous appeal, which lacked merit due to the issue preclusion and claim preclusion that arose from *CVMT 2014.*

In May 2020, after we issued *CVMT 2020*, and while the instant litigation was pending, the Burley faction terminated Corrales's representation.

B. *The Instant Litigation*

1. *Litigation Leading up to the Rulings at Issue on Appeal*

On April 12, 2019, Corrales initiated this lawsuit by filing a complaint against the Commission, seeking declaratory and injunctive relief. He sought a court order establishing that the attorney fees that he was allegedly owed based on his Fee Agreement with Burley should be paid to him directly from the Tribe's RSTF money before that money was released to the Tribe.

8

According to Corrales, he was entitled to 20 percent of the Tribe's RSTF money, which at the time allegedly totaled over $16 million.[4]

A group of individuals representing a tribal faction opposing Burley's claim to membership in and leadership of the Tribe was granted leave to intervene in the lawsuit in January 2020. The members of that group are Marie Diane Aranda, Lisa Fontanilla, Michael Mendibles, Christopher Jason Russell, and Rosalie Ann Russell. As those individuals state in their appellate brief, "[t]hey are descendants of Lena Shelton, and are thus members of the Tribe under a 2015 decision by the Assistant Secretary— Indian Affairs—of the BIA." We will refer to them as "the Shelton faction." The Shelton faction explained in their motion to intervene that Burley did not fall within the groups eligible for tribal membership, the BIA has repeatedly rejected her claim to leadership of the Tribe, and they were not aware of any actual tribal member who approved of Burley's Fee Agreement with Corrales.

In April 2020, Corrales sought an ex parte application to stay the action until the BIA recognizes a governing body for the Tribe. He stated in his declaration in support of that application that counsel for the Commission and counsel for the Shelton faction had informed him that they would not oppose a stay. However, on May 26, 2020, Corrales took his ex parte application off calendar.

Shortly before the Burley faction terminated Corrales's representation in mid-2020, they too made an appearance in the lawsuit, represented by new counsel. In making an appearance, the Burley faction stated that they

---

4    The amount of the RSTF money the Commission is holding for the Tribe continues to increase. In April 2020, Corrales represented that it exceeded $19 million.

believed Corrales's action was premature and should be dismissed without prejudice.

On December 30, 2020, Corrales filed a motion for summary judgment, arguing that the undisputed evidence established he was entitled to the relief sought in his complaint, and that the Commission should be ordered to pay his fees *immediately*, even in the midst of the ongoing leadership dispute. Specifically, Corrales contended that he was entitled to an order requiring the Commission to release directly to him the amount of $9.4 million in attorney fees.

The Commission, the Shelton faction, and the Burley faction all filed oppositions. On April 29, 2021, the trial court denied Corrales's motion for summary judgment. Among other things, the trial court explained that (1) "[d]espite [Corrales's] contentions to the contrary, it is clear from the submitted evidence that the leadership dispute within the tribe remains ongoing and is unresolved"; (2) although the relevant Fee Agreement states that Corrales is to be paid from any subsequent recovery on claims that he brings, Corrales did not show "that any recovery was ever obtained by his client in any of the lawsuits [Corrales] prosecuted on behalf of Ms. Burley and/or [the Tribe]"; and (3) Corrales did not establish he had any remedy against the Commission because he did not bring a separate, independent action against his client to determine the value and validity of any lien.

With leave from the trial court, Corrales filed a first amended complaint in May 2021. The first amended complaint added the Tribe as a defendant, naming specifically both the Burley faction and the Shelton faction. It alleged causes of action for declaratory relief, injunctive relief,

10

breach of contract, and promissory estoppel.[5] The first amended complaint acknowledged the Shelton faction's position that "Burley did not have the authority to enter into a fee agreement with Corrales, because she was not a recognized leader for the Tribe, they as members did not approve it, [and] Burley is purportedly not a legitimate Tribal member." However, Corrales disputed that contention, alleging that the "undisputed facts show that Burley had the authority in 2007 to enter into the subject Fee Agreement with Corrales." The first amended complaint alleged that the amount owed to him under the Fee Agreement was either $9,446,825.00 or $11,693,650.00. Among the relief sought in the first amended complaint was (1) an order requiring the Commission to immediately release a portion of the Tribe's RSTF money to Corrales to cover the amount owing under his Fee Agreement with Burley; or (2) in the alternative, an order requiring that when the Commission eventually releases the RSTF money to the Tribe, that it release directly to Corrales the amount owing under his Fee Agreement with Burley.

The Commission and the Burley faction filed demurrers to the first amended complaint. The Shelton faction joined in the Commission's demurrer.

2.    *The Rulings at Issue in This Appeal*

In addition to its demurrer, the Burley faction brought a motion to dismiss the first amended complaint for lack of subject matter jurisdiction. That motion is the central focus of this appeal.

In challenging the trial court's subject matter jurisdiction, the Burley faction pointed out that the first amended complaint admitted the existence of an ongoing tribal leadership and membership dispute, so that "[t]o resolve

---

5    As to the Commission, Corrales subsequently dismissed the promissory estoppel and breach of contract causes of action.

whether a valid contract exists between [Corrales] and the Tribe, the Court would have to determine who is a member of the Tribe and who is a member of the Tribe's governing body and what entity is the governing body of the Tribe." As the Burley faction explained, "the Tribe's leadership dispute is not only a 'present' problem—it is one that has lasted for two decades and began before Corrales was retained to perform work for the Tribe. . . . Corrales was hired for the purpose of securing recognition by federal and state officials of Silvia Burley's authority to represent the Tribe." (Underscoring omitted.) The Burley faction argued that "because the Court is required to sort issues of the Tribe's membership and governance, [Corrales's] claims, for the time being, are not judicable before a California Superior Court. Therefore, the Court must dismiss [the first amended complaint] for lack of adjudicatory jurisdiction over the underlying subject matter."

In his opposition to the motion to dismiss for lack of subject matter jurisdiction, Corrales relied principally on nonsequitur arguments, which confused the issue of a court's subject matter jurisdiction to decide tribal leadership and membership disputes with the issues of personal jurisdiction, sovereign immunity, and choice of law.[6] At the hearing on the motion, after

---

[6] Corrales summarized his argument, as follows: "However, the [Burley faction] consented to this Court's jurisdiction by: (1) signing a Fee Agreement with Corrales that contains an explicit waiver of sovereign immunity for the collection of his fees and the enforcement of any terms and conditions of the Fee Agreement, and provides that California State law governs; (2) intervening in the subject lawsuit as a party defendant; (3) making a general appearance through the filing of a document entitled 'Notice of Appearance'; and (4) participating in litigation and discovery in the case, and seeking orders and relief f[ro]m this Court. . . . This Court also has jurisdiction to resolve [Corrales's] State common law claims against the Tribe for breach of contract and promissory estoppel, arising out of the subject Fee Agreement, because the Fee Agreement provides that its terms and

receiving the trial court's tentative ruling, Corrales for the first time began to formulate an argument addressing the issue of subject matter jurisdiction. In that regard, Corrales argued that the trial court did not need to decide the current leadership and membership of the Tribe to grant the relief he sought. According to Corrales, in order to conclude that Burley had the authority to enter into the Fee Agreement with Corrales on behalf of the Tribe in 2007, the trial court could simply rely on the fact that the BIA, at some point, recognized Burley as a person of authority within the Tribe. He also argued it was significant that this court had previously issued an opinion stating that the Burley faction had capacity and standing to pursue the litigation against the Commission that led to *CVMT 2014*. (*California Valley Miwok Tribe, supra*, D054912.)

The trial court granted the motion to dismiss for lack of subject matter jurisdiction. After explaining that the first amended complaint alleged the existence of a tribal leadership and membership dispute, the trial court explained that "[w]ithout a clear determination by the Tribe itself as to the identity of its leaders and the scope of their authority, the court is not competent to determine whether S[i]lvia Burley had the Tribe's authority to enter into a fee agreement with [Corrales] on the Tribe's behalf." The trial court accordingly concluded that it lacked subject matter jurisdiction over the dispute, requiring that the case be dismissed. The trial court did not rule on the demurrers, which it determined were moot.

Judgment was subsequently entered, dismissing the action in its entirety for lack of subject matter jurisdiction.

---

conditions are to be enforced and interpreted in accordance with California law." (Bolding and underscoring omitted.)

Corrales then filed a motion for a new trial (Code Civ. Proc., § 657) and a motion seeking relief from default (*id*., § 473, subd. (b)). Among other things, Corrales explained that relief was warranted because he did not realize that he should have submitted evidence to oppose the motion to dismiss for lack of subject matter jurisdiction, and because he was ill while preparing his opposition and overburdened with other tasks. Corrales submitted 45 exhibits in support of his postjudgment motions, which he asked the trial court to consider in determining whether it lacked subject matter jurisdiction. Corrales explained that although he "knew of the existence of the evidence," he "did not know of or discovery [*sic*] their significance until the Court issued its tentative ruling." (Underscoring omitted.) Further, although Corrales did not request prior to entry of judgment that the action be stayed, rather than dismissed, he argued for the first time in his motion for a new trial that "[a]s an alternative, the court should have simply stayed the action without prejudice to any party in moving to reopen the case, once the Tribe gets a new governing body, and asking the parties to submit periodic updates." (Bolding and emphasis omitted.)

The trial court denied both the motion for a new trial and the motion for relief from default, stating without further elaboration that Corrales had not established sufficient grounds for such relief.

Corrales filed a notice of appeal from the judgment and from the order denying his postjudgment motions.[7]

---

[7] Corrales has filed two unopposed requests for judicial notice. The documents at issue are an October 21, 2022 trial court order in a related case, and a May 31, 2022 decision concerning the Tribe from the Assistant Secretary, Indian Affairs in the United States Department of the Interior. We grant the requests. (Evid. Code, § 452, subds. (c), (d).)

II.

DISCUSSION

A. *The Trial Court Lacked Subject Matter Jurisdiction*

    1. *Applicable Legal Standards*

Corrales's principal contention on appeal is that the trial court erred in ruling that it lacked subject matter jurisdiction over this lawsuit.

Subject matter jurisdiction, which our Supreme Court also refers to as fundamental jurisdiction, "concerns the basic power of a court to act." (*Quigley v. Garden Valley Fire Protection Dist.* (2019) 7 Cal.5th 798, 807.) "A lack of fundamental jurisdiction is the ' " ' "entire absence of power to hear or determine the case." ' " ' " (*Ibid.*) "Defects in fundamental jurisdiction . . . 'may be raised at any point in a proceeding, including for the first time on appeal' " (*ibid.*), and may be raised through any available procedural vehicle. (*Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1036 [identifying possible methods to challenge subject matter jurisdiction, including a demurrer, a motion for judgment on the pleadings, a motion to strike, a motion for summary judgment, and an answer]; *Boisclair v. Superior Court* (1990) 51 Cal.3d 1140, 1144, fn. 1 [approving of "hybrid motion to quash/dismiss" for lack of subject matter jurisdiction as "consistent with the general rule that subject matter jurisdiction can be challenged at any time during the course of an action."].)

Corrales does not dispute the well-established principle that neither the state courts nor the federal courts have subject matter jurisdiction to resolve internal disputes about the leadership or membership of an Indian

15

tribe.[8]  "Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government. [Citations.]  Although no longer 'possessed of the full attributes of sovereignty,' they remain a 'separate people, with the power of regulating their internal and social relations.' " (*Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 55.)  Thus, "certain issues are, by their very nature, inherently reserved for resolution through purely tribal mechanisms due to the privilege and responsibility of sovereigns to regulate their own, purely internal affairs . . . .  Examples of such issues include membership determinations, inheritance rules, domestic relations, and the resolution of competing claims to tribal leadership." (*Miccosukee Tribe of Indians of Florida v. Cypress* (11th Cir. 2015) 814 F.3d 1202, 1208 (*Miccosukee Tribe*).)

Numerous federal court decisions rely on principles of tribal sovereignty to explain that federal courts lack subject matter jurisdiction over tribal leadership and membership disputes.  (See, e.g., *Cayuga Nation v. Tanner* (2d Cir. 2016) 824 F.3d 321, 327 (*Cayuga Nation*) ["federal courts lack authority to resolve internal disputes about tribal law" as "[i]t is 'a bedrock principle of federal Indian law that every tribe is capable of managing its own affairs and governing itself' "]; *In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litigation* (8th Cir. 2003) 340 F.3d 749, 763

---

[8]    In his opposition to the Burley faction's motion to dismiss for lack of subject matter jurisdiction, Corrales stated that "resolution of who is presently the valid Tribal representative or whether the Tribe presently has a valid governing body, or who are rightful members of the Tribe is . . . beyond the scope of the Court's jurisdictional authority."  (Bolding and underscoring omitted.)  Corrales's position on this matter is consistent with the position he has previously taken on behalf of his then-client, the Burley faction.  As we observed in *CVMT 2020*, "[the Burley faction] do[es] not dispute that it is beyond our jurisdiction to resolve a tribal membership issue." (*CVMT 2020, supra*, D074339.)

["Jurisdiction to resolve internal tribal disputes, interpret tribal constitutions and laws, and issue tribal membership determinations lies with Indian tribes and not in the district courts."].)  The principle applies equally to state courts, divesting them of jurisdiction to resolve internal tribal leadership and membership disputes.  (*Iowa Mut. Ins. Co. v. LaPlante* (1987) 480 U.S. 9, 15 ["If state-court jurisdiction over Indians or activities on Indian lands would interfere with tribal sovereignty and self-government, the state courts are generally divested of jurisdiction as a matter of federal law."]; *U.S. v. Pawnee Business Council of Pawnee Indian Tribe of Oklahoma* (N.D.Okla. 1974) 382 F. Supp. 54, 58 [the "legion cases . . . that the Federal Courts are without jurisdiction to entertain and decide internal Indian tribal affairs, matters or disputes" "must also apply to State Courts."]; *Healy Lake Village v. Mt. McKinley Bank* (Alaska 2014) 322 P.3d 866, 867 [state trial court properly dismissed a case for lack of subject matter jurisdiction when it would have been required to resolve an intratribal leadership dispute in order to decide a lawsuit by one tribal faction seeking an order requiring a bank to change the signatory authority on the tribe's account].)

Even in California, which is one of the states where section 4 of Public Law 280 (28 U.S.C. § 1360(a)) gives a state limited civil jurisdiction over "causes of action between Indians or to which Indians are parties" in cases arising in Indian country (28 U.S.C. § 1360(a); see also *Bryan v. Itasca County, Minnesota* (1976) 426 U.S. 373, 380), California case law establishes that state courts lack subject matter jurisdiction to decide intratribal disputes involving the tribe itself.  (*Lamere v. Superior Court* (2005) 131 Cal.App.4th 1059, 1064, 1067 [in a lawsuit involving a tribal membership dispute, ordering a demurrer sustained for lack of subject matter jurisdiction, explaining that "[w]e agree with those courts that have found that . . . Public

17

Law 280 cannot be viewed as a general grant of jurisdiction to state courts to determine intratribal disputes" and that "Congress did not intend that the courts of this state should have the power to intervene—or interfere—in purely tribal matters."]; *Ackerman v. Edwards* (2004) 121 Cal.App.4th 946, 954 [concluding that the trial court lacked subject matter jurisdiction over a tribal membership dispute as there was "no merit" to the "assertion that the courts of California have jurisdiction over disputes between tribal members and tribes through Public Law 280"]; *People ex rel. Becerra v. Huber* (2019) 32 Cal.App.5th 524, 537 [noting that "[t]he cases finding no jurisdiction tend to focus on such things as whether the claims implicate tribal self-governance or membership"].)

When faced with a challenge to subject matter jurisdiction based on the presence of an issue involving an intratribal dispute, a court should examine the "claims in the case to determine if 'at their core' they present[ ] important matters of internal Tribal governance bearing upon the Tribe's status as a sovereign." (*Miccosukee Tribe, supra,* 814 F.3d at p. 1209.) Here, the trial court undertook such an inquiry, concluding that the claims asserted by Corrales would require it to resolve an intratribal dispute over whether Burley was authorized to enter into the Fee Agreement on behalf of the Tribe, and that the action was therefore not within the court's subject matter jurisdiction. " 'Where the evidence is not in dispute, a determination of subject matter jurisdiction is a legal question subject to de novo review.' " (*Saffer v. JP Morgan Chase Bank, N.A.* (2014) 225 Cal.App.4th 1239, 1248.)

2.      *The Trial Court Would Be Required to Resolve an Intratribal Dispute Over Leadership and Membership to Decide this Lawsuit*

As we have explained, the trial court determined that under the legal principles we have set forth above, it lacked subject matter jurisdiction because it could not decide Corrales's claims without deciding the purely

18

intratribal issue of whether Burley was, in fact, a member and leader of the Tribe when she entered into the Fee Agreement with Corrales in 2007.

The trial court's decision in that regard was well-founded. The first amended complaint itself acknowledges the existence of a dispute as to whether Burley was a member of the Tribe in 2007 with authority to enter into the Fee Agreement with Corrales. In the first amended complaint, Corrales describes the Shelton faction's position that "Burley did not have the authority to enter into a fee agreement with Corrales, because she was not a recognized leader for the Tribe, they as members did not approve it, [and] Burley is purportedly not a legitimate Tribal member." The first amended complaint also acknowledges that, at the time of the 2007 Fee Agreement, Burley claimed to be the tribal chairperson, but "the Tribe was involved in a Tribal leadership dispute with its former Chairman, [Dixie], who claimed he had not resigned, but that his resignation was a complete forgery." Indeed, the first amended complaint explains that in 2007 Corrales was hired by Burley *precisely because*, starting in 2005, the tribal leadership dispute had grown so contentious that the Commission decided to withhold the Tribe's RSTF money. Based on these allegations, a dispute exists about whether Burley was a tribal member and leader with authority to bind the Tribe when she entered into the Fee Agreement with Corrales in 2007. A resolution of that dispute is necessary before this lawsuit can be decided because Corrales can have no entitlement to a portion of the Tribe's RSTF money under the Fee Agreement if the Fee Agreement is not a valid contract that binds the Tribe to its provisions.

Corrales does not dispute that the trial court lacks jurisdiction to resolve a tribal leadership and membership dispute. However, in this appeal, Corrales attempts to get around that principle by further developing the

19

argument that he first raised at the hearing on the motion to dismiss for lack of subject matter jurisdiction, focusing solely on the acts of the BIA. Under this theory, "Burley was the ostensible agent for the Tribe through the BIA during the time of Corrales'[s] retention. Her authority derived from the BIA. Thus, for all intents and purposes, the Tribe is liable as the principal for Burley's actions and representations as the Tribe's ostensible agent, because both the BIA, as the giver of the Tribe's authority, and Burley, the expressly BIA-designated 'person of authority,' made representations to Corrales and to the public that led Corrales to believe that Burley had the authority to enter into a fee agreement with him on behalf of the Tribe."[9]

Corrales sets forth a list of facts alleged in the first amended complaint, as well as evidence submitted in support of his motion for a new trial, which purportedly establish that "both Burley and the BIA made certain representations that Burley had the authority to enter into the subject Fee Agreement with Corrales on behalf of the Tribe." Some of these alleged facts, as described in Corrales's appellate briefing, include that (1) "The BIA entered into 638 federal contract funding with Burley as the sole

---

[9] In his appellate briefing, Corrales argued that based on the BIA's dealings with Burley around the time of the 2007 Fee Agreement, "the Tribe and the BIA act[ed] *jointly* as the principal for purposes of Burley having the ostensible authority to act for the Tribe during the time the BIA conferred upon her the status of 'person of authority' or 'spokesperson' for the Tribe." (Italics added.) At oral argument, however, Corrales changed his theory, claiming that he was "overly generous" in his appellate briefing when stating that the Tribe and the BIA acted jointly as principals in conferring ostensible authority on Burley. Instead, Corrales's current argument is that only the *Tribe* was the principal, but that the BIA's act of recognizing Burley as a person of authority within the Tribe nevertheless served to confer ostensible authority on her. Although we acknowledge the difference in the evolving legal theories, the distinction is not material to our analysis.

representative of the Tribe from 1999 through 2009";[10] and (2) "The BIA began referring to Burley as the 'person of authority' or 'spokesperson' for the Tribe in 2004, and never withdrew that designation until December 30, 2015 . . . ." Corrales argues that "[t]hese undisputed facts and allegations support Burley's ostensible authority to enter into the subject Fee Agreement on behalf of the Tribe." (Underscoring omitted.)

Before turning to the merits of Corrales's ostensible authority argument, we address the contention, raised by both the Burley faction and the Shelton faction, that we should not consider Corrales's ostensible authority argument because Corrales did not raise it in the trial court. (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548 [" ' "As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal" ' "].) Although we understand respondents' arguments, we have decided to address the merits of Corrales's ostensible authority

---

10     The first amended complaint is vague about the dates during which the BIA entered into 638 contracts with the Tribe. Specifically, the first amended complaint alleges that "*[t]hroughout the years*, the BIA considered Burley to be the 'Chairperson' of the Tribe, then later a 'person of authority' or 'spokesperson' for the Tribe for purposes of entering into 638 federal contract funding for the Tribe." (Italics added.) Although it is not important for the purposes of this appeal for us to determine the actual years in which the BIA entered into 638 contracts with the Tribe, we note that in connection with the Burley faction's opposition to Corrales's motion for summary judgment, Burley submitted a declaration that provides a more detailed chronology. According to Burley's declaration, "In 2005, the Central California Agency, Bureau of Indian Affairs halted the Tribe's 638 contract funding and cited the internal tribal leadership dispute. After a lengthy litigation battle, funding resumed to pay for 2005-2007. [¶] . . . The Central California Agency, Bureau of Indian Affairs halted funding again in 2008, once again citing internal tribal leadership dispute. [¶] . . . Funding resumed in 2011 after the Assistant Secretary-Indian Affairs' decision in December 2010. [¶] . . . In late 2011, the Central California Agency, Bureau of Indian Affairs has once again halted funding."

21

theory for two reasons. First, although Corrales did not discuss the theory of ostensible authority in the trial court in any formal manner, he did orally argue at the hearing on the motion to dismiss for lack of subject matter jurisdiction that the trial court could look to the BIA's relationship with Burley to resolve the case without deciding an intratribal dispute. Thus, the issue was arguably raised below, albeit in a very cursory and undeveloped manner, and without using the words "ostensible authority." More importantly, to the extent Corrales did not sufficiently raise the issue of ostensible authority below, judicial efficiency will be served if we nevertheless exercise our discretion to consider the issue. Specifically, Corrales has brought to our attention that, despite the judgment in this case, less than a week after the trial court denied his postjudgment motions, he filed a new lawsuit against the same parties raising almost identical claims. (*Corrales v. California Valley Miwok Tribe* (Super. Ct. San Diego County, 2022, No. 37-2022-00012884-CU-BC-CTL).) As stated in Judge Timothy Taylor's minute order staying Corrales's new lawsuit pending the outcome of this appeal, Corrales's new lawsuit is "virtually identical" to this action. Judge Taylor's minute order states that Corrales "has acknowledged in open court that the two cases are the same except for the addition of the common counts in the present case." Although Judge Taylor optimistically observed that he expects Corrales to voluntarily dismiss the new lawsuit if Corrales does not prevail in this appeal, given Corrales's demonstrated enthusiasm for engaging in protracted litigation, there is a reasonable risk that if we decline to address Corrales's ostensible authority argument, Corrales may rely upon that theory

22

in his new lawsuit as a reason to resist a voluntary dismissal of that action.[11]

Turning to the merits, we begin our discussion by reviewing the doctrine of ostensible authority. " 'An agent is one who represents another, called the principal, in dealings with third persons.' (Civ. Code, § 2295.) 'In California agency is either actual or ostensible. (Civ. Code, § 2298.)' " (*J.L. v. Children's Institute, Inc.* (2009) 177 Cal.App.4th 388, 403 (*J.L.*).) "Ostensible authority is authority that the principal, either intentionally or by lack of ordinary care, causes or allows a third party to believe the agent possesses. [Citation.] Ostensible authority is based on the principle of estoppel, and requires the essential elements of estoppel, i.e., representation, justifiable reliance, and changed position as a result of the reliance." (*Taylor v. Roseville Toyota, Inc.* (2006) 138 Cal.App.4th 994, 1005 (*Taylor*).) "Before recovery can be had against the principal for the acts of an ostensible agent, three requirements must be met: The person dealing with an agent must do so with a reasonable belief in the agent's authority, such belief must be generated by some act or neglect by the principal sought to be charged and

---

[11] We remind Corrales of the principles of claim preclusion and issue preclusion that we discussed in *CVMT 2020* in connection with our order imposing sanctions on him. Due to *CVMT 2020*, Corrales is clearly on notice regarding the existence of those doctrines, and he has a duty to consider whether they apply to his currently pending lawsuit.

We note also that, at oral argument, counsel for the Burley faction argued that monetary sanctions should be imposed on Corrales in this appeal "to prevent continued abuse of the judicial process." The applicable court rules require that a party seeking the imposition of monetary sanctions file a written motion, supported by a declaration, "no later than 10 days after the appellant's reply brief is due." (Cal. Rules of Court, rule 8.276(b)(1).) As no such written motion was filed with this court, counsel's request for sanctions is procedurally improper, and we express no view on the merits of the request.

the person relying on the agent's apparent authority must not be negligent in holding that belief. [Citations.] Ostensible agency cannot be established by the representations or conduct of the purported agent; the statements or acts of the principal must be such as to cause the belief the agency exists." (*J.L.,* at pp. 403-404.)

Corrales's theory is that regardless of whether Burley was the *actual* agent of the Tribe (which would be an internal tribal issue beyond the court's jurisdiction to decide), Burley had *ostensible* authority to act as an agent in binding the Tribe to the Fee Agreement in 2007 because of actions taken by the BIA.

The first and perhaps most obvious flaw in Corrales's theory is that for ostensible authority to apply, Corrales's belief that Burley, as an agent, possessed authority to bind a principal "must be generated by some act or neglect *by the principal sought to be charged*." (*J.L.*, *supra*, 177 Cal.App.4th at pp. 403-404, italics added.) Corrales argues that the BIA's actions conferred ostensible authority on Burley to enter into the Fee Agreement on behalf of the Tribe. However, the BIA is not "the principal sought to be charged" in Corrales's lawsuit because Corrales has not filed suit against the BIA to recover his attorney fees. Instead he has sued the Tribe and the Commission, attempting to recover from the Tribe's RSTF money. Plainly, the Tribe is the "principal sought to be charged" by Corrales because he seeks to recover under the Fee Agreement from the Tribe. However, because Corrales focuses only on the BIA's actions for his ostensible authority argument, Corrales has not identified any "act or neglect *by the principal sought to be charged*." (*Ibid*, italics added.)

Another flaw in Corrales's theory is that it rests on a fundamental misunderstanding of the role of the BIA in making decisions about who is an

24

authorized tribal representative.  Ostensible authority rests on principles of estoppel (*Taylor*, *supra*, 138 Cal.App.4th at p. 1005), but "estoppel is barred where the government agency to be estopped does not possess the authority to do what it appeared to be doing."  (*Medina v. Board of Retirement* (2003) 112 Cal.App.4th 864, 870.)  Case law is clear that the only time the BIA has the authority to make decisions recognizing a tribal representative is when the BIA is compelled to do so for its *own* limited purposes, such as identifying a tribal representative to enter into 638 contracts.  As one court has explained, "The BIA, of course, regularly recognizes a tribe's undisputed leadership without limitations through its course of dealing with the tribe.  When there is a conflict over tribal leadership, however, the BIA is precluded from issuing a recognition decision *except* where a federal purpose requires recognition.  For that reason, such decisions will typically carry some kind of limiting language." (*Cayuga Nation, supra,* 824 F.3d at p. 329.)  "[T]he BIA has the authority to make recognition decisions regarding tribal leadership, but 'only when the situation [has] deteriorated to the point that recognition of some government was essential for *Federal* purposes.' [Citation.]  Thus, the BIA 'has both the authority and responsibility to interpret tribal law *when necessary to carry out the government-to-government relationship with the tribe.*' " (*Id.* at p. 328, second italics added.)

Because the BIA undertakes the role of recognizing a tribal representative *solely* for the purpose of carrying out federal contracting, the BIA has no authority to decide which tribal representative is authorized to bind a tribe to a contract with a third party.  (*Attorney's Process and Investigation Services, Inc. v. Sac & Fox Tribe of Mississippi in Iowa* (8th Cir. 2010) 609 F.3d 927, 943 [the court rejected the argument that the BIA's recognition of a competing tribal faction established the validity of a third

25

party contract entered into with the competing tribal faction, explaining that "[b]ecause tribal governance disputes are controlled by tribal law, they fall within the exclusive jurisdiction of tribal institutions . . . and the BIA's recognition of a member or faction is not binding on a tribe"].) Thus, even though, as Corrales alleges, the BIA recognized Burley as a "person of authority" to enter into federal contracts on behalf of the Tribe around the time of the 2007 Fee Agreement, the BIA possessed no authority to designate Burley as a tribal agent for the purpose of entering into a Fee Agreement with Corrales—a third party—on behalf of the Tribe.

Although we have cited the Second Circuit's opinion in *Cayuga Nation, supra,* 824 F.3d at pages 328-329, for the fundamental principle that the BIA is not authorized to resolve intratribal leadership disputes except for the limited purpose of engaging in its own federal contracting with a tribe, Corrales contends that the holding of *Cayuga Nation* supports his ostensible authority argument. As we will explain, Corrales's contention lacks merit. The issue in *Cayuga Nation* was whether, in the context of a tribal leadership dispute, a federal court is required to look to the BIA's recognition of a tribal representative when the federal court seeks to identify a tribal representative authorized to initiate federal litigation on behalf of the tribe. The Second Circuit explained that it indisputably "lack[ed] jurisdiction to resolve the question of whether this lawsuit was properly authorized as a matter of *tribal law*." (*Id*. at p. 328.) However, "[t]o conclude that the case may go forward only if those who filed it were authorized to do so under tribal law either would require the court to answer disputed questions of tribal law—the very thing that federal courts are forbidden to do—or else would prevent the tribe from suing at all, thus rendering the tribe helpless to defend its rights in court." (*Ibid*.) Thus, the Second Circuit concluded that to avoid a "result . . .

26

disastrous for the tribe's rights," in which the tribe would have no recourse in court to protect its rights, it would look to the BIA's recognition of a tribal representative to determine which tribal representative has the authority to bring a federal lawsuit for the tribe. (*Ibid.*) As *Cayuga Nation* explained, "Like the BIA, which must determine whom to recognize as a counterparty to administer ongoing contracts on behalf of the [tribe], the courts must recognize someone to act on behalf of the [tribe] to institute, defend, or conduct litigation. Lacking jurisdiction to resolve the question of governmental authority under tribal law, and lacking the authority under federal law (not to mention the resources and expertise of the BIA) to question the decision of the Executive about whom the federal government should recognize as speaking for the [tribe], the only practical and legal option is for the courts to consider the available evidence of the present position of the Executive and then defer to that position." (*Id.* at p. 330.)

Corrales argues, "Just as 'a recognition decision from the BIA' was 'sufficient' to 'find that the recognized individual has the authority to initiate a lawsuit on behalf of the tribe' in *Cayuga Nation*, the BIA's recognition of Burley as the [Tribe's] 'spokesperson,' 'authorized representative,' and 'person of authority' here is sufficient to find that she had authority to sign the Fee Agreement retaining Corrales on the [Tribe's] behalf." Corrales's argument fails because *Cayuga Nation* decided a very limited issue. That case stands for nothing more than that a federal court is required to follow the BIA's lead when determining whether a particular tribal representative is authorized to file a lawsuit on behalf of the Tribe. *Cayuga Nation* does not hold that a court may rely upon the BIA's recognition of a tribal representative for any other purpose. Thus, *Cayuga Nation* does not support Corrales's contention that we may look to the BIA's recognition of Burley as a person of authority

27

in the Tribe to decide that Burley had the authority, on behalf of the Tribe, to enter into the Fee Agreement with Corrales in the midst of a tribal leadership dispute.[12]

In his reply brief, Corrales argues that our opinion in *CVMT 2014, supra,* 231 Cal.App.4th 885 supports his contention that the BIA conferred ostensible authority on Burley to enter into the Fee Agreement. Referring to *CVMT 2014*, Corrales states, "this Court has already held that it is proper for the Commission to defer to the BIA in its recognition decision for purposes of determining who is authorized to accept RSTF proceeds for the Tribe." Corrales argues that *CVMT 2014* "supports [his] argument that the trial court, just like the Commission, can also look to public records to see how the BIA had designated Burley to be a 'person of authority' for the Tribe with respect to 638 federal contract funding to conclude that she would have the same authority to retain Corrales for the Tribe." The argument fails because it depends on a plainly unreasonable interpretation of *CVMT 2014.* In *CVMT 2014*, we concluded that in deciding whether an authorized tribal representative exists who can properly receive the RSTF money on behalf of the Tribe, the Commission was entitled to wait until the BIA has resumed a

---

12      At oral argument, Corrales acknowledged that *Cayuga Nation, supra,* 824 F.3d 321, was limited to holding that a federal court is required to look to the BIA's recognition of a tribal representative when it seeks to identify the party that is authorized to initiate federal litigation on behalf of a tribe. However, Corrales argued that this case falls under that limited umbrella because "in order to initiate a lawsuit, you have to hire a lawyer." Thus, according to Corrales, *Cayuga Nation* directly supports the conclusion that Burley, as a tribal representative, was authorized—by virtue of the BIA's recognition of her as a person of authority within the Tribe—to enter into a binding contract for legal services on behalf of the Tribe. We reject the argument. *Cayuga Nation* says nothing to suggest that the BIA has the authority to designate a tribal agent to bind a tribe to a contract for legal services with a third party in the midst of a tribal leadership dispute.

government-to-government relationship with the Tribe for the purpose of entering into a 638 contract. Specifically, we explained that "[g]iven the BIA's obligation to ensure that it is dealing with a tribe's duly constituted government, if the BIA chooses to resume contracting for ISDEAA benefits with the Tribe, the Commission will be justified in viewing that action by the BIA as a decision that the Tribe has a duly constituted government and an authorized tribal representative." (*CVMT 2014*, at p. 908.) Nothing we said in *CVMT 2014* can reasonably be interpreted as suggesting that the BIA has the authority to decide, on behalf of the Tribe, which tribal representative was authorized to enter into binding contracts with third parties.

Finally, in a departure from his reliance on the theory of ostensible authority, Corrales argues that the trial court had subject matter jurisdiction to decide whether he could recover against the Tribe under principles of quantum meruit without deciding the validity of the Fee Agreement. According to Corrales, "If the subject written Fee Agreement is found to be invalid for any reason, Corrales is still entitled to quantum meruit recovery for the reasonable value of his services. He does not need to prove the existence of a contract."

There are at least two problems with Corrales's quantum meruit argument. First, the first amended complaint does not seek relief based on a theory of quantum meruit, and thus Corrales cannot now, on appeal, claim to seek recovery against the Tribe, in this lawsuit, on that basis.[13] Second, recovery under quantum meruit would still require the trial court to resolve the issue of whether Burley represented the Tribe in entering into the Fee Agreement and accepting the legal services provided to her by Corrales. "To

[13]   Indeed, Corrales acknowledges that he pled his quantum meruit claim for the first time in the new lawsuit pending before Judge Taylor.

29

recover in quantum meruit, a party need not prove the existence of a contract [citations], but it must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made.' " (*Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 458.) To determine whether the Tribe had an " 'understanding or expectation' " (*ibid.*) that it would be making payment to Corrales for his provision of services to Burley, the trial court would be required to determine whether Burley represented the Tribe.[14]

In sum, we conclude that there is no merit to Corrales's contention that the trial court had subject matter jurisdiction to decide the claims he has asserted in this action. To resolve whether a binding Fee Agreement exists or whether Corrales provided legal services to Burley with the understanding he would be paid by the Tribe, the trial court would be required to resolve an intratribal leadership and membership dispute over which it lacks subject matter jurisdiction. The trial court thus properly dismissed the action for lack of subject matter jurisdiction.

B.  *Corrales Has Not Established That the Trial Court Erred in Denying His Postjudgment Motions*

Next, we consider Corrales's contention that the trial court erred in denying his postjudgment motions. " ' "We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard." [Citations.] " 'A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.' " ' " (*People v. Lightsey* (2012) 54 Cal.4th 668, 729.) Similarly, a motion for relief

---

14    Because we address, on the merits, the issue of whether the trial court would have subject matter jurisdiction over Corrales's quantum meruit claim, we expect our decision to create issue preclusion in Corrales's new lawsuit.

from default under Code of Civil Procedure section 473, subdivision (b) " 'shall not be disturbed on appeal absent a clear showing of abuse.' " (*Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 257.)

One of the grounds for a new trial is "[e]rror in law, occurring at the trial and excepted to by the party making the application." (Code Civ. Proc., § 657, subd. (7).) As we understand Corrales's argument, he relies on this provision to argue that the trial court should have granted his motion for a new trial because he purportedly established that the trial court committed legal error when it stated it could consider evidence outside the pleadings in determining whether it lacked subject matter jurisdiction. Specifically, Corrales points out that the trial court's minute order cited *Great Western Casinos, Inc. v. Morongo Band of Mission Indians* (1999) 74 Cal.App.4th 1407 (*Great Western*) for the proposition that "*when faced with a claim of sovereign immunity*, the court may look beyond the pleadings if needed and engage in a factual inquiry to determine whether it has subject matter jurisdiction over a dispute." (Italics added.) According to Corrales, the trial court erred because the issue presented was not the Tribe's *sovereign immunity* but rather whether the trial court lacked subject matter jurisdiction. Corrales contends that "it is undisputed that the [Burley faction's] motion to dismiss was not based on sovereign immunity, and the trial court therefore was not required to look outside the pleadings to rule on the motion."

Although the trial court admittedly created some confusion by referring to sovereign immunity, Corrales's argument fails because *Great Western* sets forth a rule that applies to all types of challenges to subject matter jurisdiction, not just challenges based on sovereign immunity. Explaining that tribal sovereign immunity is often viewed as an issue of the court's subject matter jurisdiction, *Great Western* expressly assumed for the sake of

31

its analysis that the procedural rules governing challenges to subject matter jurisdiction applied. (*Great Western, supra,* 74 Cal.App.4th at p. 1417.) Having done so, *Great Western* discussed those procedural rules. As *Great Western* explained, "if subject matter jurisdiction may be challenged at any time during the course of an action it is logical for the court to consider all admissible evidence then before it in making its determination—whatever the procedural posture of the case. Permitting as thorough a review by the court considering the challenge is in accord with the principle a court's subject matter jurisdiction is so fundamental it may be attacked at any time." (*Id.* at p. 1418.) Thus, Corrales is simply wrong when he contends that the trial court should not have relied on *Great Western* to state that it could look to evidence outside the pleadings in ruling on the Burley faction's motion. *Great Western* establishes that a court may look to evidence outside the pleadings in ruling on a challenge to its subject matter jurisdiction, such as the motion that was pending before the trial court.

Moreover, although Corrales attacks the trial court's statement that it was permitted to look to evidence outside of the pleadings, the trial court's minute order shows that the trial court *did not* rely on any evidence beyond the pleadings in making its ruling. The trial court looked solely to Corrales's allegations in the first amended complaint to determine that it would be required to resolve an intratribal leadership and membership dispute to decide Corrales's lawsuit. Thus, even if there were some merit to Corrales's contention that the trial court was limited to looking to the pleadings in determining whether it lacked subject matter jurisdiction, that is precisely the approach that the trial court took.

Corrales claims in an argument heading in his opening appellate brief that he is also challenging the trial court's denial of his motion for relief from

default.  However, he presents no coherent argument challenging that ruling. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as forfeited."  (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1075.)

We accordingly conclude that Corrales has not identified any ground on which the trial court erred in denying his postjudgment motions.

C.      *Corrales Did Not Seek a Stay of the Action*

Corrales argues that "the trial court's refusal to stay the action, instead of dismissing it, pending organization of the Tribe's governing body was an abuse of discretion."[15]

Generally, we apply an abuse of discretion standard in reviewing a trial court's decision to deny a requested stay of an action.  (See, e.g., *Bains v. Moores* (2009) 172 Cal.App.4th 445, 480 [abuse of discretion standard in reviewing a request to stay until witnesses involved in parallel criminal proceedings were available].)  Here, however, there is no trial court decision to review because Corrales did not request a stay in response to the Burley faction's motion to dismiss for lack of subject matter jurisdiction.  The only time, prior to judgment, that Corrales requested a stay was when he filed an ex parte application seeking a stay in April 2020, with the concurrence of the

---

[15]      Corrales's only legal argument to support his contention that the trial court should have stayed the action is based on the status of a federal district court interpleader action titled *In re $323,647.60 in Funds Belonging to the California Valley Miwok Tribe* (E.D.Cal. 2019, No. 1:19-cv-00242-DAD-SAB), in which, in light of the Tribe's ongoing leadership and membership dispute, the federal court has stayed the action.  Documents pertaining to that action were attached to Corrales's declaration in support of his postjudgment motions.  Without citing any California authority, Corrales argues that the trial court should have "follow[ed] the lead" of those federal court proceedings, and that it abused its discretion in failing to do so.

opposing parties, but then withdrew it, subjecting his opponents to another two years of litigation.

Corrales argued for the first time in his motion for a new trial that the trial court should have stayed the action rather than dismissing it for lack of subject matter jurisdiction.  However, that request was untimely because the trial court had already dismissed the case.  As we have explained, Corrales has not established that the trial court erred in rejecting his attempt to vacate that dismissal through his postjudgment motions.

DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:



O'ROURKE, Acting P. J.



DO, J.

34

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MANUEL CORRALES, JR., | D080288 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2019-00019079-CU-MC-CTL) |
| CALIFORNIA GAMBLING CONTROL COMMISSION et al., | |
| | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Respondents. | |

THE COURT:

The opinion in this case filed June 23, 2023 was not certified for publication.  It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.


O'ROURKE, Acting P. J.

Copies to:  All parties